**PUERTO RICO TOBACCO MARKETING COOPERATIVE ASS'N v. McCOMB.**

No. 4417.

United States Court of Appeals
First Circuit.

April 28, 1950.

E. Martinez Rivera, San Juan, Puerto Rico (Luis Blanco Lugo, San Juan, Puerto Rico, on brief), for appellant.

Bessie Margolin, Assistant Solicitor, Washington, D. C. (William S. Tyson, Solicitor, and William A. Lowe and Harry A. Tuell, all of Washington, D. C. and Kenneth P. Montgomery, Regional Attorney, Santurce, Puerto Rico, on brief), for appellee.

Before MAGRUDER, Chief Judge, and MARIS and WOODBURY, Circuit Judges.

WOODBURY, Circuit Judge.

The Administrator of the Wage and Hour Division, United States Department of Labor, brought the instant action against the Puerto Rico Tobacco Marketing Cooperative Association to restrain it from violating § 15(a) (1), (2), and (5) of the Fair Labor Standards Act of 1938, 52 Stat. 1068, 29 U.S.C.A. § 215(a) (1), (2), (5) with respect to certain of its warehouse and stemmery employees. The court below on stipulated facts and the testimony of one expert witness called by the Administrator, entered judgment for the plaintiff according to the complaint and the defendant thereupon took this appeal.

The defendant is a cooperative association incorporated not for pecuniary profit under Insular Act No. 70 of 1925. Laws of Puerto Rico 1925, p. 368 et seq. It has a principal office in San Juan, and tobacco warehouses and stemmeries in eight other municipalities in the Island. Its warehouse and stemmery operations at Comerio have been stipulated, we take it because they typify its operations of that kind elsewhere, and it is stipulated that all of its employees there "are engaged in processes or occupations necessary to the production of goods for interstate commerce and, therefore, are within the general coverage of the Fair Labor Standards Act and are entitled to its benefits unless they are exempted by specific provisions of the Act." The specific exemption provisions involved are those having to do with agricultural employments embodied in §§ 13(a) (6) and 13 (a) (10) of the Act.

The Association handles only tobacco grown by its members, of whom there are about 7,000, and each member is under contract to market all his tobacco through the Association. The latter by the terms of its contracts with its members takes title to the tobacco as soon as it has "potential existence", but the member is responsible for his crop until he delivers it to the Association. Upon delivery the Association grades and weighs the tobacco, and then processes it for marketing exclusively in continental United States. It is stipulated that the Comerio warehouse and stemmery, and on our assumption its other warehouses and stemmeries also, is a "first concentration point" for all tobacco received and worked upon there within the meaning of that term as used by the Administrator in his definition of "area of production" with respect to Puerto Rico leaf tobacco. Regulations Defining Area of Production, as amended December 1946, § 536.2(a) (2) and (c).

The members first dry their tobacco in barns or sheds on their premises and then deliver it at the Association's warehouses in loose bales or bundles weighing about one quintal, or one hundred pounds. There it is first weighed and receipted for and then graded according to type and quality. Following this the tobacco is put into piles known locally as "estibas" of about 150 quintales and allowed to ferment under controlled conditions of temperature for about two months, during which time the piles are torn down and rebuilt by moving the inside leaves to the outside of the pile, and vice versa, some six or eight times as the fermentation process requires. When this fermentation process, known as bulking, is completed the tobacco is stacked for later stemming.

When the stemming season starts the fermented tobacco is reclassified into tobacco of inferior quality, known as "boliche", and tobacco of superior quality. The "boliche" is not stemmed, but merely fumigated and packed for shipment. The tobacco of superior quality which is to be stemmed is first dipped in water to soften it for the purpose, and then the moistened leaves are left in piles for several days. After this the piles are separated into packages called "pesadas" weighing 5 or 6 pounds and these "pesadas" are wrapped in cloth and taken to a steaming room from which they are later removed for delivery to the stemmers.

Stemming consists in removing the central vein or rib from the tobacco leaf. It is performed manually, usually by women, who hold the point of the vein or rib in their teeth and pull away the sides of the leaf with their hands. The separated leaves of tobacco after stemming are roughly classified by the stemmer and stacked by her on

the bench at which she works. Employees known as reviewers check her work, and then carry the stemmed leaves to a place in the warehouse where they are collected for baling into bulks or "tongas" for a second fermentation process similar to the one already described, but lasting only about a month. When the second fermentation process is complete, the tobacco is dried, sorted, classified according to quality, and packed for shipment to the United States.

In addition to the employees engaged in the processes described, the Association also has two or three employees in each warehouse who work during the harvesting season in dispatching material such as fertilizer, cord, Paris green, etc., to the members, and one or more others who deliver this material to the members by truck. It also employs laborers who move tobacco from place to place in the warehouses to prevent spoilage by heat, other laborers who collect, clean and fumigate the scrap tobacco resulting from the stemming process, repair and maintenance men, men who move bales of tobacco ready for shipment, and persons who perform the necessary supervision, clerical and office work.

The Administrator concedes, but only for the purpose of this case, "that within the meaning of the applicable regulations and terms of the law, employees engaged in the receipt of stalk-out-tobacco, in the classification and bulking of such tobacco and in the reclassification, packing, moving and fumigating of such tobacco prior to stemming are exempt from the minimum wage and overtime provisions of the Fair Labor Standards Act, by virtue of Section 13(a) (10) when they are engaged in the listed occupations in an establishment which is a first concentration point for such tobacco." And, as already pointed out, the Administrator also concedes that the defendant's warehouses and stemmeries are in fact first concentration points for tobacco within his own definition. Furthermore the Administrator concedes that the defendant has paid at

least the legal minimum wage of 27 cents per hour * to all of its employees engaged in processing operations from wetting in preparation for stemming on to final shipment. Nor does he allege that the defendant has violated any of the provisions with respect to maximum hours of employment contained in § 7 of the Act.

The conduct of the defendant, which it admits, of which the Administrator complains is the employment of certain of its employees during the same workweek both on work which he concedes is exempt from the minimum wage provisions of the Act and on work which he contends is not exempt, and the payment of those employees at the rate of 27 cents per hour for their time on allegedly non-exempt work but only 25 cents per hour for their time on concededly exempt work. He contends that this split workweek basis for paying these employees is in violation of the Act; they being entitled to the 27 cents per hour minimum wage for every hour worked in every week in which any part of their work is non-exempt. And the Administrator also contends that the defendant has failed to keep the records required by § 11(c) of the Act with respect to its stemmers, who are paid piece rates, although he concedes that these employees are not employed more than 40 hours in any workweek and are paid substantially more than the legal minimum wage.

The defendant on this appeal rests its defense solely upon the broad dual proposition, first, that all of its employees are exempt from the provisions of the Act for the reason that they are employed in agriculture, within the meaning of § 13(a) (6), and second, that they are also exempt from the provisions of the Act for the reason that they are employed within the area of production in handling and preparing agricultural commodities in their raw or natural state for market, within the meaning of § 13(a) (10).

* Wage Order for the Leaf Tobacco Industry in Puerto Rico promulgated by the Administrator pursuant to §§ 5 and 8 of the Fair Labor Standards Act, which became effective, after publication in the Federal Register, on April 1, 1945. Title 29, Ch. V, Code of Federal Regulations, Part 657.

The defendant's contention that its employees fall within the exemption of § 13(a) (6) because they are "employed in agriculture" as that term is defined in § 3(f) must be categorically rejected on the authority of Farmers Reservoir & Irrigation Co. v. McComb, 337 U.S. 755, 69 S.Ct. 1274, in which the Supreme Court rejected the same contention with respect to the employees of an incorporated mutual ditch company organized on a non-profit basis by a group of farmers in Colorado for the purpose of collecting, storing, and proportionately distributing water to its farmer-members for irrigation purposes. In its opinion in the above cited case the court pointed out, 337 U.S. at page 762 et seq., 69 S.Ct. at page 1278, that the definition of agriculture in § 3(f) had two branches—first a "primary meaning" which includes "farming in all its branches"; specific farming practices, such as cultivation and tillage of the soil, dairying, etc. being listed as illustrative, and a secondary broader meaning which includes "any practices, whether or not themselves farming practices, which are performed either by a farmer or on a farm, incidentally to or in conjunction with" farming operations within the primary definition. Then the court said that clearly the operations of the irrigation company, and we must say the same with respect to the operations of the defendant marketing company, did not fall within the primary meaning of agriculture as defined in the above section of the Act for the reason that it owned no farms and raised no crops, and hence could not be said, 337 U.S. at page 764, 69 S.Ct. at page 1279, to be "engaged in cultivating or tilling the soil or in growing any agricultural commodity." Following this the Supreme Court rejected the contention, not advanced in the case at bar, that the employees of the irrigation company come within the exemption because its activities were necessary to the production of agricultural commodities, and then, coming to the secondary branch of the definition, the court pointed out that to qualify for exemption the work must be done "by a farmer or on a farm." It then said, and we must say also: "In the present case it is clear that the work of the company's employees is done neither on a farm or by farmers."

The Supreme Court next went on to state and reject a further argument advanced by the irrigation company, and one also advanced by the marketing company in the case at bar. The court said, referring to the work of the employees of the irrigation company, "Clearly, it is not done on a farm. Nor, we think, is it done 'by a farmer.' Since we have already said that the company's employees are not engaged in farming, it is perhaps too obvious that the work that they do is not done by farmers. But an argument to the contrary is made. It is based on the fact that the company is a mutual one, owned by the farmers whom it serves. It is argued that the company is therefore merely a formal conduit or agent, by which the farmers cooperatively operate their common water supply system and cooperatively employ the men. The men are, therefore, said to be farmers because they are said to be employed by farmers."

The Supreme Court answered the above argument by first pointing out that "There is a difference between the hiring of mutual servants by a group of employers and the creation by them of a separate business organization, with its own officers, property, and bonded indebtedness, which in turn hires working men", and then pointing out that "Those working men are in no real sense employees of the shareholders of the organization. They are hired by the organization, fired by the organization, controlled and directed by the organization, and paid by it." And following this the court continued: "The fact that the organization is a corporate one adds to the picture but is not controlling. The controlling fact is that the company has been set up by the farmers as an independent entity to operate an integrated, unitary water supply system. The function of supplying water has thus been divorced by the farmers from the farming operation and set up as a separate and self-contained activity in which the farmers are forbidden, by the company's by-laws, to interfere. Those employed in that activity are employed by the company, not by the farmers who own the company.

The fact that the company is not operated for profit is immaterial. It is nonetheless the employer." On the basis of the foregoing the court concluded that the irrigation company employees were not exempt under § 13(a) (6) from the coverage of the Act.

The Farmers Reservoir & Irrigation Co. case is squarely in point in all material respects and rules the case at bar *so far as* § 13(a) (6) is concerned. Indeed the language of the Supreme Court in that case is directly applicable, *mutatis mutandis*, to the case at bar. See also to the same effect the decisions of this court in Bowie v. Gonzalez, 117 F.2d 11; Calaf v. Gonzalez, 127 F.2d 934; Vives v. Serralles, 145 F.2d 552, and McComb v. Super-A Fertilizer Works, 165 F.2d 824.

We turn, therefore, to the defendant's further contention that its employees are nevertheless exempt under § 13(a) (10) of the Act which in so far as material provides that the minimum wages and maximum hours sections of the Act, §§ 6 and 7, shall not apply with respect to "any individual employed within the area of production (as defined by the Administrator), engaged in handling, packing, storing, * * * drying, preparing in their raw or natural state * * * agricultural or horticultural commodities for market * * *." The argument of the defendant is that its employees are working in an area of production as defined by the Administrator, which he admits, and that they are engaged in handling and preparing for market an agricultural or horticultural commodity, which the Administrator concedes, *in its raw or natural state,* which the Administrator denies.

The crucial words are those in italics; the specific question being whether tobacco continues to be in its "raw or natural state" after stemming or whether it does not.

The court below found as a fact on the testimony of the Administrator's expert witness that the process of fermenting leaf tobacco as described in the stipulation "produces a chemical change in the tobacco by making it milder and sweeter", [80 F.Supp. 953, 954] and in the course of its memorandum opinion that court held "that the stemming and fermenting of leaf tobacco are operations which change the form and nature of the tobacco and is a processing operation rather than 'handling, packing, storing' ", etc. of agricultural or horticultural commodities "in their raw or natural state". Wherefore that court concluded as matter of law that: "Defendant's employees engaged in fermenting leaf tobacco and in stemming leaf tobacco and in any handling of tobacco subsequent to those operations are not engaged in handling, packing, storing, drying or preparing tobacco in its raw or natural state within the meaning of Section 13(a) (10) of the Fair Labor Standards Act of 1938." Consequently, in view of its holding that the defendant's employees were not engaged in agriculture within the meaning of § 13(a) (6), with which we agree, and its conclusion that the split workweek basis for paying some of its employees violates the Act and that the stemmers' records were not kept as the Act requires, with which we are not concerned, it entered the judgment for the Administrator from which this appeal was taken.

As the economy of this country is now organized almost all agricultural commodities pass through a series of handling, packing, storing, ginning, compressing, pasteurizing, drying or preparing processes on their way from the farm to the ultimate consumer. And, for reasons not far to seek, see Bowie v. Gonzalez, 1 Cir., 117 F.2d 11, 18, it was obviously the purpose of the framers of the Fair Labor Standards Act of 1938 by it § 13(a) (10) to exclude from the benefits of the Act "any individual employed" in any of the above processes with respect to agricultural or horticultural commodities, provided, first, that the employment was within the area of production as administratively defined, and second, that the employee, except for cannery and creamery employees, who are specifically mentioned, was engaged in working on commodities of the kinds described "in their raw or natural state." The problem here is to determine at what point in the course of

preparation for market leaf tobacco passes from its "raw or natural" state.

The words "raw" and "natural" in their statutory setting defy definition in broad terms generally applicable to all agricultural or horticultural commodities. "Raw" is the antithesis of "cooked", and cooking connotes a chemical change wrought by heat. Thus, since fermenting also produces a chemical change and usually implies heat, or at least warmth, it may perhaps be likened to slow cooking. But cooking ordinarily implies the application of heat by human means from some source outside the thing cooked, whereas, when conditions are right, fermenting occurs spontaneously and naturally within the thing fermented. And furthermore, the latter process may involve so little heat as to make application to it of the term "cooking" wholly inappropriate. Moreover, while cooking and fermenting both produce chemical changes, so also, no doubt, does ripening, and in the case of fruits, the chemical change incident to ripening makes the fruit sweeter and milder. But certainly ripening cannot appropriately be likened to cooking, or, in all probability, to fermenting.

Similar problems arise with respect to the word "natural". There can be no doubt that Indian corn ceases to be in its natural state as soon as it is ground. But does it remain in its natural state throughout the entire course of its processing previous to grinding, which involves breaking from the stalk, husking, drying and shelling from the cob? A host of other illustrative problems come to mind, but enough has been said to indicate the inherent difficulty, if not the impossibility, of formulating any workable definition of the statutory words applicable generally to all agricultural or horticultural commodities.

Specific situations will have to be considered as they arise, and in keeping with the spirit and purpose of the Act a line drawn between exempt and non-exempt employment in accordance with the statutory wording. And, this line must be drawn by the courts, Addison v. Holly Hill Fruit Products, 322 U.S. 607, 64 S.Ct. 1215, 88 L.Ed. 1488, 153 A.L.R. 1007, so that of necessity it must be pricked out by the slow process of deciding concrete cases as they arise.

In this case we agree with the line of distinction with respect to leaf tobacco drawn by the court below. Perhaps within the statutory wording it might possibly be drawn a step earlier in the processing, i. e., at the first fermenting, rather than at stemming, but the Administrator's concession that workers engaged in processing prior to stemming are exempt makes it unnecessary for us to consider the point. Whether leaf tobacco comes from the first fermentation process "raw" or not, a very close question perhaps, the leaf certainly was not in its natural state after its central vein or rib was removed. This changed its form. The process is comparable to grinding a cereal grain, for instance, and we think clearly marked the line between exempt and non-exempt work. Our judgment is perhaps arbitrary in the sense that the line could conceivably be drawn somewhere else without doing violence to the statutory language, but in cases of this sort arbitrary judgments in this limited sense cannot wholly be avoided. The best that can be done is to draw a line of distinction with respect to each commodity at some practical point within the statutory language, and this in our opinion is exactly what was done by the court below. We, therefore, agree with the conclusion it reached.

The judgment of the District Court is affirmed.