James P. MITCHELL, Secretary of Labor, United States Department of Labor,

v.

WHITAKER HOUSE COOPERATIVE, INC., Philip S. Bird, President, Evelyn M. Whitaker, Treasurer and General Manager, and Evelyn M. Whitaker, individually.

Civ. No. 1050.

United States District Court
D. Maine, N. D.
Feb. 13, 1959.

Thomas L. Thistle, Regional Atty., U. S. Dept. of Labor, Wage and Hour Division, Boston, Mass. (Stuart Rothman, Sol., John J. Babe, Asst. Sol., U. S. Dept. of Labor, Washington, D. C., on the briefs), for plaintiff.

Philip S. Bird, Waterville, Me., for defendants.

GIGNOUX, District Judge.

This is an action brought by the Secretary of Labor under the Fair Labor Standards Act of 1938, as amended, 29 U.S.C.A. § 201 et seq., to enjoin the defendants from violating the provisions of the Act. Jurisdiction is conferred by Section 17 of the Act. 29 U.S.C.A. § 217.

The complaint, filed September 30, 1957, alleges that since July 18, 1957 defendant Whitaker House Cooperative, Inc., defendant Bird as President of the Cooperative, and defendant Whitaker as Treasurer and General Manager of the Cooperative, have violated the provisions of Sections 15(a) (1), 15(a) (2) and 15(a) (5) of the Act by paying wages to approximately 100 women (hereinafter descriptively called homeworkers) producing infants' knitted and crocheted outerwear which is sold by the defendant Cooperative in interstate commerce, at rates less than the minimum wage rates established by Section 6 of the Act; and by failing to keep certain records, and to obtain special homework certificates with respect to such homeworkers as required by the regulations issued by the Administrator of the Wage and Hour Division, Department of Labor, under Sections 11 (c) and 11(d) of the Act.[1] The complaint also alleges similar violations of the Act by Mrs. Whitaker, individually, from September, 1954 through July 17, 1957. However, at the conclusion of plaintiff's evidence the parties filed a stipulation of dismissal of the action against Mrs. Whitaker individually and in her capacity as Treasurer of the defendant Cooperative. There thus remain for consideration only the charges against the defendant Cooperative and the individual defendants in their respective capacities as President and General Manager of the Cooperative.

At a pre-trial conference on February 4, 1958, it was conceded by the defendants that the homeworkers herein involved are engaged in the production of goods for interstate commerce and that, with respect to these homeworkers, the defendants have violated the minimum wage, record-keeping and homework certificate provisions of the Act, if the Act is applicable. It was further stipulated by the parties that the only issue for determination by this Court is whether or not the homeworkers, all of whom are members of the defendant Cooperative, are "employees" of the defendants within the meaning of the Act. Defendants agree that if these homeworkers are "employees", defendants have violated the Act and the injunction should issue.

Evidence upon the issue as thus limited was heard by the Court on September 23, 24 and 25, 1958. Briefs were submitted by the parties on December 1, 1958, and reply briefs were filed on December 15, 1958. At the request of the parties, the Court heard oral argument on December 30, 1958, and the parties were provided until January 19, 1959 for the filing of additional materials requested by the Court relating to the legislative history of the Fair Labor Standards Act.

As indicated, the issue for determination by this Court is whether the homeworker-members of the Cooperative are "employees" of the defendants within the meaning of the Fair Labor Standards Act. Plaintiff's position is that the homeworker-members are covered by the Act, on two grounds. First, plaintiff

---

1. The records required under authority of Section 11(c) of the Act are prescribed in Regulations, Part 516, Subparts A and B, 29 CFR §§ 516.1–516.24.

The pertinent regulations issued by the Administrator under authority of Section 11(d) of the Act are Part 617, Employment of Homeworkers in the Knitted Outerwear Industry, 29 CFR §§ 617.1–617.12.

contends that the Cooperative is not a *bona fide* cooperative controlled by its members; that, in reality, the individual defendants control the Cooperative and its business; and that hence an employment relationship exists between the homeworker-members and the defendants, and the Act applies, under the rule of Fleming v. Palmer, 1 Cir., 1941, 123 F.2d 749, certiorari denied, sub nom., Caribbean Embroidery Cooperative, Inc. v. Fleming, 1942, 316 U.S. 662, 62 S.Ct. 942, 86 L.Ed. 1739. See also McComb v. Homeworkers' Handicraft Cooperative, 4 Cir., 1949, 176 F.2d 633, certiorari denied, 1949, 338 U.S. 900, 70 S.Ct. 250, 94 L.Ed. 553. Plaintiff further contends that even if the Cooperative is a *bona fide* cooperative controlled by its members, still the Act applies to a member-controlled cooperative. Defendants take the position that the Cooperative is, in fact, a *bona fide* cooperative organized and controlled by its members for their own benefit, and that the Act does not apply to the relationship between such a cooperative and its members.

The first issue thus presented is one of fact and requires an examination of the background, organization and present operation of the Cooperative. The evidence in this respect establishes the following history:

Mrs. Whitaker has lived in Troy, Maine for approximately forty-seven years. About twenty-five years ago, she first became engaged in the business of buying hand-made infants' knitted and crocheted outerwear for various out-of-state concerns.[2] The articles handled by her at that time were obtained from approximately 100 ladies in the vicinity of Troy, who either knitted or crocheted the garments as part-time work in their homes. Mrs. Whitaker furnished the yarn. About fifteen years ago Mrs. Whitaker ceased doing business and transferred her yarn business to Mrs. Pearl L. Nutter, a neighbor in Troy.[3] Approximately five years ago Mrs. Whitaker reentered the business, and from September, 1954 to July 17, 1957 she was engaged, as before, in purchasing, handling and selling infants' knitted and crocheted outerwear from her home in Troy. During this period 163 ladies furnished articles to Mrs. Whitaker. All of these ladies did their work during their spare time in their homes. At her home in Troy, Mrs. Whitaker employed one helper to add ribbon or embroidery to the garments received by her from the homeworkers, and to assemble the garments in sets. Mrs. Whitaker packaged the garments and shipped them to her retail outlets. She maintained an inventory of goods, which varied in amount from season to season, and kept complete books and records. She did not employ a broker to sell the garments, nor did she furnish the yarn, which the homeworkers obtained from other sources. She set the price which she paid for the finished garments on a piece-rate basis. The finished garments were either mailed or delivered to her residence, and payment was by check. In short, the relationship between Mrs. Whitaker and these homeworkers was substantially identical to that between Mrs. Nutter and her homeworkers, which this Court described at length, and held to be an employment relationship within the Fair Labor Standards Act, in Mitchell v. Nutter, D.C.Me., 1958, 161 F.Supp. 799. There can be no question that if Mrs. Whitaker were presently operating as previously, her operations would fall within the scope of Nutter, and an injunction should issue.

In January, 1957, following a compliance investigation by the Wage and Hour Division of the Department of Labor, Mrs. Whitaker, through her at-

---

2. Newport Knitting Co., Babyknit, and Edward S. Wagner Co. See McComb v. Edward S. Wagner Co., D.C.E.D.N.Y., 1950, 89 F.Supp. 304, reversed on other grounds, sub nom., Tobin v. Edward S. Wagner Co., 2 Cir., 1951, 187 F.2d 977, and Mitchell v. Edward S. Wagner Co., 2 Cir., 1954, 217 F.2d 303, certiorari denied 1955, 348 U.S. 964, 75 S.Ct. 524, 99 L. Ed. 752.

3. See Mitchell v. Nutter, D.C.Me., 1958, 161 F.Supp. 799.

torney, Mr. Bird, was formally advised by the Regional Attorney of the Wage and Hour Division that the homeworkers were her employees within the meaning of the Fair Labor Standards Act, and that if she wished to continue her business in the manner in which she was then operating, it would be necessary for her to comply with the minimum wage and record-keeping provisions of the Act. Various conferences were thereafter held among Mrs. Whitaker, Mr. Bird and the Wage and Hour Division Investigator, both at Mrs. Whitaker's home in Troy and at Mr. Bird's office in Waterville, Maine, for the purpose of determining the steps which could be taken to insure compliance with the Act. At these conferences the possibility of the organization of a cooperative was discussed, and it was suggested that the Act would not apply if the business were to be conducted by the homeworkers themselves as the members of a cooperative.[4]

As a result of these conferences, in late June and early July, 1957 Mr. Bird proceeded with the organization of a cooperative under the Consumer's Cooperative Act of the State of Maine (R.S.Me. 1954, c. 56). The following steps were taken for this purpose. Small subscription fees were obtained from various prospective members to help pay the expenses of organization. Mr. Bird mailed to prospective members a letter dated June 28, 1957, describing the nature and advantages of cooperatives and the method of their organization, and calling a meeting "of all the homeworkers who are interested in establishing a cooperative," to be held on July 9, 1957 at the Jefferson Hotel in Waterville.[5] Approximately 40 women, all of whom had previously

4. The testimony of Mrs. Whitaker, who was plaintiff's sole witness, and of various homeworker-members of the Cooperative, who testified for defendants, was that the suggestion that the business be reorganized on a cooperative basis originated with the Wage and Hour Division Investigator, who also advised that in his opinion the Act would not apply if the business were reorganized as a *bona fide* cooperative controlled by the homeworkers themselves. Although personally present in Court, the Investigator did not testify. In order to avoid the necessity of his doing so, the parties stipulated at the conclusion of the hearing that if he were called, he would testify that at various conferences between him and Mr. Bird during the spring of 1957 the possibility of the organization of a cooperative was discussed; that the idea of a cooperative did not originate with the Wage and Hour Division; and that "the idea of organizing a cooperative arose spontaneously as a result of these joint discussions, no one participant in the discussions being solely responsible." It was further stipulated that the Investigator was not authorized to state the official position of the Wage and Hour Division.

5. The following excerpts from this letter are significant:

"June 28, 1957

"Dear

"You have indicated by sending your subscription fee to this office that you are interested in establishing an organization which will enable you and many others like you to continue your home work business and which will enable you to have a ready market for the products which people such as you make in your own homes. The purpose of this letter is to briefly outline the method by which such an organization is established and operated. * * *

"In the past whenever a group of individuals has been confronted with a situation whereby they could not as individuals do certain things for themselves as well as they could as a group, they have, in thousands of cases, organized what is known as a *Cooperative*. * * *

"Generally speaking a cooperative consists of a group of individuals who have established an organization to promote the economic welfare of each individual who is a member. Each individual member has rights equal to that of every other member * * *. In a cooperative everyone is on an equal basis. Thus a cooperative is a very democratic type of organization.

\*    \*    \*    \*    \*

"A cooperative of home workers here in Maine would benefit the home workers in the following ways:

"1. It would enable them to comply with the Federal Laws concerning wage and hour regulations.

"2. It would enable them to purchase supplies at wholesale prices.

"3. It would enable them to market their products more readily.

supplied Mrs. Whitaker with infants' wear, were present at the organizational meeting thus called. Mr. Bird presided, and Mrs. Whitaker was also present. At this meeting formal Articles of Association were signed by the individual defendants and 26 of the ladies present; Mr. Bird explained the proposed Certificate of Organization and By-laws which had been prepared by him; after discussion and a few minor changes, the form of Certificate of Organization was approved and the By-laws were adopted; and a board of five Directors and a Clerk was elected. The Directors elected were Mrs. Fernande Loubier, Mrs. Dana Banton, Mrs. Audrey Leavit, Mrs. Nettie Boyington and Mrs. Harold Edmonds. Stanley L. Bird, Esq., the defendant Bird's father, was named Clerk. Immediately following adjournment of the organizational meeting, the Board of Directors met and elected Mrs. Banton as its Chairman, Mr. Bird as President and Mrs. Whitaker as Secretary-Treasurer. Mr. Jack Kennedy, a cousin of Mrs. Whitaker's husband and a retired electrician from Vassalboro, Maine, was elected Vice President. All of the Directors had previously supplied Mrs. Whitaker with infants' wear. However, none of the Directors was in any way related to Mrs. Whitaker, and only Mrs. Leavit and Mrs. Edmonds had previously worked for her as trimmers or had been associated with her in any other business

capacity. The statutory Certificate of Organization of the Cooperative was signed by the officers and Directors on the day of the meeting. It was approved by the Office of the Attorney General of the State of Maine on July 10, 1957 and recorded in the Registry of Deeds for Waldo County, Maine on July 12, 1957. A copy was filed with the Secretary of State of the State of Maine on July 18, 1957. On the same date Mrs. Whitaker ceased doing business individually, and the Cooperative commenced doing business, with its place of business at Mrs. Whitaker's home in Troy.

The Certificate of Organization is in the simple form customary in Maine practice. It provides for the organization of a cooperative without capital stock; states that its purposes shall be, among others, "to manufacture, sell and deal in knitted, crocheted, and embroidered goods of all kinds and in general to carry on a knitted wear business of making and selling knitted, crocheted, or embroidered clothing either at wholesale or retail"; and lists the names of the original Directors and officers.

The By-laws are also in usual form,[6] and copies have been printed and distributed to the membership. Because of their direct bearing on the issue of whether the Cooperative is controlled by the individual defendants or by the homeworkers, it is necessary to sum-

"4. It would increase the uniformity of products.

"5. As a going organization they would be able to exert more influence in matters effecting (sic) their economical (sic) welfare.

"6. It would enable them to take advantage of other economic opportunities which as a group they could obtain at reduced costs, such as hospitalization, life insurance, etc.

"A cooperative is organized by first having a meeting of the people who are interested in setting up the cooperative. At this meeting they organize themselves into an association for the purpose of establishing a cooperative. They decide what the purposes of the cooperative will be, what the rules and regulations will be concerning membership and the op-

eration of the cooperative, the election of a board of directors and officiers (sic), signing of the incorporation papers, and planning for an over all business policy for the coming years * * *.

   *      *      *      *      *

"There is every reason to believe that people such as yourselves could make a cooperative work successfully. As a matter of fact, I believe that this is the only way in which you can expect to reach a large market and to obtain the maximum amount of economical (sic) benefit from the work which you perform in your own homes.
                    "Very truly yours,
                    "Bird & Bird
                    "By          "

6. See Packel, Law of Cooperatives, Pages 385–403 (3rd ed. 1956).

marize their provisions in some detail. They provide that the objective of the Cooperative shall be "to promote the economic welfare of members and to perform any and all other related functions found desirable by the Cooperative to further the economic welfare of the members." They also confirm that the Cooperative is formed not for profit and shall not have capital stock. They state that the members of the Cooperative are to consist of the original incorporators and such persons, firms or corporations as are accepted for membership by the members, or by the Board of Directors or by its authorized representative. Each member is required to acquire a "membership interest" at a cost of $3 and to agree to comply with the Articles of Incorporation and the By-laws. No person may own more than one share interest in the Cooperative, and membership interests are not transferrable. The Board of Directors, after notice and hearing, may expel any member for failure to comply with the By-laws or any duly adopted rule or regulation of the Cooperative. Each member is entitled to one vote, to be cast in person and not by proxy. An annual meeting of the members is to be held each year and such special meetings as are called by the President, either on his own initiative or when directed by the Board of Directors or when requested by 10% of the members. Two weeks' written notice of members' meetings is necessary, and the quorum originally required was 51% of the members.[7]

The By-laws further provide that the Directors and officers of the Cooperative shall be elected, for one-year terms, by and from the members, and that at all elections nominations shall be made from the floor and the voting shall be by closed ballot. The Directors are responsible for managing the affairs of the Cooperative. Regular meetings of the Directors are to be held monthly, and special meetings as called by the President or any three Directors. The powers of the President are limited to presiding at members' and Directors' meetings, without the right to vote at members' meetings except in the event of a tie, or, at Directors' meetings unless he is also a Director. The Vice President is empowered to act for the President in the event of the latter's absence or disability. The Treasurer has the custody and control of the funds of the Cooperative, and is authorized to sign checks. The By-laws also provide for the selection by the Board of Directors of a Manager, who "shall have general supervision over the property and the affairs of the Cooperative, subject always, however, to the direction, management and control of the Board of Directors." An officer or Director may be removed by vote of 75% of the members present at a meeting called for the purpose. The Treasurer and Manager must be bonded.

The By-laws provide that the capital of the Cooperative shall consist of the aggregate amount of the membership interests and that any "excess receipts" of the Cooperative, after payment of its operating expenses, may, at the discretion of the Board of Directors, be used for patronage refunds to the members to be distributed according to the percentage of work submitted to the Cooperative for sale. The By-laws expressly prohibit the payment of dividends to members on their membership interests. As originally adopted, the By-laws prohibited the sale by members to any wholesale or retail business of products similar to those produced by the Cooperative, and required the members to obtain all of their materials from the Cooperative.[8]

Finally, the By-laws provide that they may be amended only by vote of a majority of the members present at a meeting called for the purpose.

Shortly after the Cooperative started business, the Directors employed Mrs.

7. The 51% quorum proved to be unworkable, and was reduced to a requirement of 25 members at the annual meeting held on June 26, 1958. Infra p. 750, 751.

8. This provision was also deleted by vote of the members at the annual meeting on June 26, 1958, infra p. 750, 751.

Whitaker as General Manager at a salary of $55 per week, and approved payment of a salary of $50 per week to Mr. Bird for his services as President and legal counsel.[9] As President, Mr. Bird has not participated actively in the management of the business of the Cooperative, other than through his attendance and advice at members' and Directors' meetings. As General Manager, Mrs. Whitaker receives articles sent or delivered to her home by the members; makes out duplicate invoice slips itemizing the articles submitted and noting the "advancements" then due the members; supervises the trimming and packing by a conceded Cooperative employee; fills orders by mailing the goods directly to the stores which purchase them; completes the invoice and shipping records; receives the checks in payment for articles purchased; deposits the checks in the Cooperative checking account and forwards the deposit slips to the Treasurer.[10] The Treasurer now makes payments to the members once every two months upon the basis of the duplicate invoice slips furnished by Mrs. Whitaker, in a total amount specified by the Directors.

At the date of the hearing the Cooperative had a total membership of approximately 200 ladies, including some from outside the State of Maine. During the fourteen months from the organization of the Cooperative to the date of the hearing, a total of twelve Directors' meetings, one annual meeting of members, and one special meeting of members had been held. Mr. Bird was present and presided at all these meetings, except at the annual membership meeting when he was absent. Mrs. Whitaker was present at all the meetings for the purpose of reporting on the business of the Cooperative; although she frequently left a meeting after completing her report. Neither Mr. Bird nor Mrs. Whitaker voted at any meeting. It is significant that at almost every meeting of the Board of Directors from 4 to 30 members, other than the Directors, were also present and participated in the discussions.

A review of the minutes of the members' and Directors' meetings held during this period reveal the following typical actions taken at these meetings. On July 24, 1957, at the first meeting of the Directors following the organization of the Cooperative, it was voted to purchase Mrs. Whitaker's entire inventory at market prices, and also her accounts receivable.[11] On August 22, 1957 the Directors voted to pay members on or before the 20th of the month for all goods received by the 10th of that month. At the same meeting the Directors authorized the preparation of an exclusive sales agreement with Mrs. Doris Law.[12] On October 10, 1957 the Directors accepted the resignation of Mrs. Whitaker as Treasurer and elected Mrs. Banton in her place. This election was confirmed at a special meeting of the members held on October 26, 1957. At that special meeting the members voted not to pay for goods received between the 10th and 20th of November until December 19, 1957. There were 41 members present at this meeting. On January 21, 1958 the Directors voted to drop 3 members because of sub-standard work and authorized the President to apply for a $5,000 bank loan to be secured by inventory. On March 6, 1958, the previous application having been rejected by the bank, the Directors authorized the President to reapply for a $5,000 loan to be secured by the personal endorsement of the Directors and the Vice

9. It was stipulated by the parties that Mr. Bird's salary represented "fair and reasonable compensation" for his services to the Cooperative.

10. Mrs. Whitaker resigned as Treasurer in October, 1957 and was replaced by Mrs. Banton, infra, p. 750.

11. The evidence indicates that the accounts receivable were not in fact taken over by the Cooperative.

12. This is the same Mrs. Law who was the defendant in Mitchell v. Law, D.C. W.D.Tenn., 1957, 161 F.Supp. 795.

President.[13] The Directors further voted that no advance allowances be paid to members until the articles submitted by them had been sold. On April 10, 1958, the bank loan having been negotiated, the Directors established a loan repayment fund. On May 15, 1958 the Directors authorized partial advances to members on a percentage basis, and approved the date and agenda for the annual meeting of the members. On June 26, 1958 the annual meeting of the members was held at the Pilots' Grill in Bangor, Maine. Notice of this meeting was mailed to all members, and 37 were present in person. In Mr. Bird's absence, the Vice President, Mr. Kennedy, presided, and Mrs. Whitaker, as General Manager, gave a report on the status of the business of the Cooperative. A full financial report was presented for the Treasurer by Francis W. Jacob, Esq., who had been employed by the Directors in September, 1957 to act as tax counsel and auditor for the Cooperative.[14] At this meeting the members also voted to amend the By-laws to reduce the quorum requirement to 25 members, and to delete the By-law provision requiring that members obtain all their materials from the Cooperative. The Vice President appointed a Nominating Committee, and the officers and Directors were unanimously reelected, except that Mrs. Matilda Ireland and Mrs. Ola Miller were named to replace Mrs. Boyington and Mrs. Loubier as Directors, and Mr. Jacob was elected Clerk.[15] Further meetings of the Directors were held on July 23, August 16, and September 11, 1958, at which various methods were discussed for solving the financial problems which the Cooperative was facing.

Financially, the operation of the Cooperative has been far from a success, primarily because of excessive inventory and overhead, and lack of sales. As of September 4, 1958 it had an operating deficit of $4,537. During its first twelve months of operation its gross sales amounted to $45,000,[16] and Mr. Jacob's testimony indicated that the Cooperative could survive as a financially solvent enterprise only by doubling its present gross income. Its inability to keep pace with its current overhead is probably best reflected in the fact that, as of September, 1958, it had paid Mr. Bird only $1,750 of the $2,950 then due him for salary; had paid Mrs. Whitaker only $1,441 of the $3,290 then due her for salary; had paid Mrs. Whitaker only $951 of the $7,110 due her for her inventory; and had utilized the entire $5,000 bank loan for operating expenses. Payments to members for articles furnished by them are now made only once every two months, and there are substantial past-due accounts. The understanding has consistently been that the members would receive at least 60% of the sale price of an article, with 20% going to operating expenses and 20% to sales commissions. In practice the members have actually received about 58% thereof.

As indicated, the first issue presented is one of fact: Is this business controlled by the individual defendants or is it controlled by the homeworkers? For if, in reality, the Cooperative is controlled by the individual defendants, then "the simple, economic fact is that the members are working for the * * * (individual defendants) and hence are employees of the * * * (individual defendants)

---

13. Neither Mrs. Whitaker nor Mr. Bird endorsed this note.

14. Mr. Jacob is a graduate of Bowdoin College and Harvard Law School and a former Professor at Law at the University of Idaho Law School. Since his retirement 20 years ago, he has engaged in taxation and business counselling from his residence in South China, Maine. He is not related to Mrs. Whitaker, nor had he been previously associated with her in any business capacity.

15. Neither Mrs. Ireland nor Mrs. Miller is related to Mrs. Whitaker. Neither had had any previous business relationship with her, except that Mrs. Ireland had supplied Mrs. Whitaker with infants' wear.

16. Mrs. Whitaker did a gross business of approximately $19,000. during her last, and most successful, year of individual operation.

and the cooperative within the meaning of the Act." Fleming v. Palmer, supra, 123 F.2d at page 751.

█ A close examination of the history, corporate structure and present operation of this Cooperative, which have been recited in detail above, compels the conclusion that this Cooperative is a *bona fide* cooperative organized and controlled by its members for their mutual benefit, and that it is not merely a subterfuge created and utilized by the individual defendants for the purpose of protecting Mrs. Whitaker's business operations from the application of the Fair Labor Standards Act.

█ It is true that the individual defendants actively participated in the organization of the Cooperative for the express purpose of attempting to avoid application of the Fair Labor Standards Act to the homeworkers here involved. However, this fact alone is not sufficient to bring the Cooperative within the scope of the Act. Fleming v. Palmer, supra, 123 F.2d at page 759. Avoidance of a federal regulatory statute is not synonymous with its evasion. To organize Mrs. Whitaker's former homeworkers into a cooperative for the purpose of permitting them to continue to produce and sell their handiwork in a manner not within the reach of the law was not illegal or immoral. If, in fact, the Act does not apply to a true cooperative controlled by its members, these ladies had a right so to organize, and the individual defendants had a right to assist them in doing so. From this record, it appears that this was what was done in this instance. Cf. Walling v. Plymouth Mfg. Corp., 7 Cir., 1943, 139 F.2d 178, certiorari de-

nied 1944, 322 U.S. 741, 64 S.Ct. 1144, 88 L.Ed. 1574.

Plaintiff places much reliance upon Fleming v. Palmer, supra, and McComb v. Homeworkers' Handicraft Cooperative, supra, but neither case supports plaintiff's position with respect to this Cooperative. In Fleming v. Palmer, the Court was presented with a pseudo-cooperative which it found to be under the complete domination and control of the Palmers and operated by them for their sole benefit. In McComb v. Homeworkers' Handicraft Cooperative, the evidence revealed a cooperative functioning as a mere instrumentality of the bag companies, which had been the worker-members' former employers. Here, a thorough study of the record discloses control of the Cooperative to be vested, both under its By-Laws and in actual operation, in the member-workers, who have agreed to pool their labor and split their profits in a joint enterprise for their own benefit.

█ On the present record, the Court finds as a fact that the individual defendants do not control this Cooperative or its members, and that the members are not as a matter of economic fact working for the individual defendants. The Court has accordingly concluded that the Fair Labor Standards Act is not applicable to the business of this Cooperative, as it has been set up and operated, unless the Act applies to member-controlled cooperatives *per se*.

It, therefore, becomes necessary for the Court to pass upon plaintiff's second contention, which is that the Act is applicable to a *bona fide* cooperative controlled by its members.[17]

---

17. In the course of argument and in their brief the defendants conceded that there is a serious question as to the legality of the organization of the Cooperative under the Maine Consumer's Cooperative Act, which would appear to contain no provision for the organization of a marketing cooperative such as here involved. The defendants have also conceded the absence of the quorum required by the By-laws and other minor irregularities in connection with the two membership meetings which have been held by the Cooperative. The record before this Court, however, discloses that the Certificate of Organization has received the approval of the authorities of the State of Maine as meeting the requirements of the Maine statute. Whether the requirements of Maine law have been met is not an issue in this case and is certainly a different issue from the issues of control and of the applicability of the Fair Labor Standards Act here involved.

Initially, it must be noted that there is no doubt that a cooperative *may* be an employer and have employees subject to the provisions of the Fair Labor Standards Act. Farmers Reservoir & Irrigation Co. v. McComb, 1949, 337 U.S. 755, 69 S.Ct. 1274, 93 L.Ed. 1672; Puerto Rico Tobacco Marketing Cooperative Ass'n v. McComb, 1 Cir., 1950, 181 F.2d 697.[18] Thus in the instant case the ladies who are hired to do the trimming and packing for the Cooperative, and Mrs. Whitaker as General Manager, are conceded by the defendants to be employees of the Cooperative. Further, this Court has held that the Act applies to homeworkers *per se*. Mitchell v. Nutter, D.C.Me.1958, 161 F.Supp. 799. The only substantial issue before this Court, therefore, is whether the producer-members of a marketing cooperative are its employees within the meaning of the Act.[19]

There is no reported case considering the issue here presented. The Court of Appeals for this Circuit in Fleming v. Palmer, supra, expressly declined to pass on the question because of its factual conclusion that the cooperative there involved was controlled by the Palmers and not by its members. For similar reasons the question was not reached by the Court of Appeals for the Fourth Circuit in McComb v. Homeworkers' Handicraft Cooperative, supra.

As recently stated by this Court in Nutter, the question here at issue is to be determined, not by the traditional test of the master-servant relationship under the common law, but by a consideration of the history, terms and purposes of the Fair Labor Standards Act. Walling v. American Needlecrafts, Inc., 6 Cir., 1943, 139 F.2d 60, 63. See Walling v. Portland Terminal Co., 1947, 330 U.S. 148, 150–151, 67 S.Ct. 639, 91 L.Ed. 809; Rutherford Food Corp. v. McComb, 1947, 331 U.S. 722, 729, 67 S.Ct. 1473, 91 L.Ed. 1772. The Court must then be guided in its decision by the intent of Congress in the passage of the Act as revealed by the language of the statute, its legislative history and its purposes.

The Act itself in Section 3(e) defines "employee" as including "any individual employed by an employer." 29 U.S.C.A. § 203(e). And "employ" is defined in Section 3(g) as including "to suffer or permit to work." 29 U.S.C.A. § 203(g). It is true that this definition of employment was described by Senator (now Mr. Justice) Black as "the broadest definition that has ever been included in any one Act," 81 Cong.Record 7657, and in United States v. Rosenwasser, 1945, 323 U.S. 360, 65 S.Ct. 295, 89 L.Ed. 301, the Supreme Court stated in respect to this statutory language (323 U.S. at page 362, 65 S.Ct. at page 296): "A broader or more comprehensive coverage of employees within the stated categories would be difficult to frame." However, the statutory definition in the Act itself

Cf. Fleming v. Palmer, supra, 123 F.2d at page 762. This proceeding is not the forum for collateral attack upon the corporate existence of this Cooperative. Taylor v. Portsmouth, Kittery & York Street Ry., 1898, 91 Me. 193, 199, 39 A. 560; see Consolidated Electric Cooperative v. Panhandle Eastern Pipeline Co., 8 Cir., 1951, 189 F.2d 777, 782. Similarly, the evidence reveals that the operation and conduct of the business of the Cooperative have been in substantial conformity with the By-laws. Any failure to comply technically with the By-laws in every respect is immaterial to this decision and merits no further discussion.

18. Section 3(a) of the Act, 29 U.S.C.A. § 203(a), provides: " 'Person' means an individual, partnership, association, corporation, * * * or any organized group of persons." The definition of "employer" in Section 3(d) of the Act, 29 U.S.C.A. § 203(d) incorporates this definition of "person". See Fn. 19 infra.

19. There can be no question that under Section 3(d) of the Act, 29 U.S.C.A. § 203(d), an injunction should issue against the individual defendants as officers of the Cooperative if an employment relationship is found to exist between the Cooperative and these homeworkers, for Section 3(d) defines "employer" to include "any person acting directly or indirectly in the interest of an employer in relation to an employee."

is hardly helpful in providing an answer to the present question. In fact, the judicial decisions interpreting and applying the Act have consistently held that there is no simple, uniform and easily applicable test to determine whether persons doing work for others are within the scope of the Act, but that the test is whether as a matter of "economic reality" such persons are employees. United States v. Silk, 1947, 331 U.S. 704, 713, 67 S.Ct. 1463, 91 L.Ed. 1757.

The legislative history of the Act is similarly unenlightening. Specific Congressional references to cooperatives, in context, are directed solely to the applicability of the Act to persons who are "employees" of a cooperative in the sense concluded by Farmers Reservoir & Irrigation Co. v. McComb, supra.[20]

It, therefore, becomes necessary to examine the purposes of the Act in order to determine whether Congress intended that it apply to the relationship between a marketing cooperative and its producer-members.

As stated by the Supreme Court in United States v. Darby, 1941, 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609, the Fair Labor Standards Act sets up a "comprehensive legislative scheme for preventing the shipment in interstate commerce of certain products and commodities produced in the United States under labor conditions as respects wages and hours which fail to conform to standards set up by the Act." 312 U.S. at page 109, 61 S.Ct. at page 454. In the same case the

Court declared that the purposes of the Act, as set forth in the declaration of policy contained in Section 2(a),[21] are "to exclude from interstate commerce goods produced \* \* \* under conditions detrimental to the maintenance of the minimum standards of living necessary for health and general well-being" (312 U.S. at page 109, 61 S.Ct. at page 455) and "to make effective the Congressional conception of public policy that interstate commerce should not be made the instrument of competition in the distribution of goods produced under substandard labor conditions \* \* \*" (312 U.S. at page 115, 61 S.Ct. at page 457). It has also been authoritatively stated that the broad scope of the Act cannot be denied. United States v. Rosenwasser, 1945, 323 U.S. 360, 362, 65 S.Ct. 295, 89 L.Ed. 301. And the Act has been described as "highly remedial" and calling for "a liberal construction so as to embrace every employer or employee coming reasonably within its scope." McComb v. Consolidated Fisheries Co., D.C.Del., 1948, 75 F.Supp. 798, 800, affirmed 3 Cir., 1949, 174 F.2d 74. See also Fleming v. Palmer, supra, at page 762; Bowie v. Gonzalez, 1 Cir., 1941, 117 F.2d 11, 16.

The teaching of the above cases is that this Court should adjudge an employment relationship to exist here, if *reasonably*, these Cooperative members can be considered "employees" under the Act. However, neither the declaration of policy contained in the Act itself,[22] nor the

---

**20.** See e. g. 81 Cong.Record 7660, 7873, 7876, 7927–7928, 7947, 8658; and 82 Cong.Record, Part 2, 1506, 1776, 1784 and 1802. Similarly, the publications of the Wage and Hour Division themselves purport only to deal with the applicability of the Act to common law "employees" of a cooperative and not with its applicability to members of a cooperative. See e. g. 29 C.F.R. §§ 780.80–.82 (1949) (Farmers' Cooperative Associations).

**21.** 29 U.S.C.A. § 202(a). "The Congress hereby finds that the existence, in industries engaged in commerce or in the production of goods for commerce, of labor conditions detrimental to the maintenance

of the minimum standard of living necessary for health, efficiency, and general well-being of workers (1) causes commerce and the channels and instrumentalities of commerce to be used to spread and perpetuate such labor conditions among the workers of the several States; (2) burdens commerce and the free flow of goods in commerce; (3) constitutes an unfair method of competition in commerce; (4) leads to labor disputes burdening and obstructing commerce and the free flow of goods in commerce; and (5) interferes with the orderly and fair marketing of goods in commerce."

**22.** See fn. 21, supra.

judicial decisions interpreting and applying the Act indicate that the intent of Congress was to exclude from interstate commerce goods produced otherwise than under substandard labor conditions resulting from an employment relationship in which the conditions of the relationship require the protection of the Act. Thus in Brooklyn Savings Bank v. O'Neil, 1945, 324 U.S. 697, 65 S.Ct. 895, 89 L.Ed. 1296, the Supreme Court stated (324 U.S. at pages 706–707, 65 S.Ct. at page 902): "The statute was a recognition of the fact that *due to the unequal bargaining power as between employer and employee,* certain segments of the population required federal compulsory legislation to prevent private contracts on their part which endangered national health and efficiency and as a result the free movement of goods in interstate commerce." (Emphasis supplied.) Again in Walling v. Portland Terminal Co., supra, the Supreme Court said (330 U.S. at page 152, 67 S.Ct. at page 641): "The Act's purpose as to wages was to insure that every person whose *employment* contemplated compensation should not be *compelled* to sell his services for less than the prescribed minimum wage." (Emphasis supplied.) And in National Labor Relations Board v. Hearst Publications, Inc., 1944, 322 U.S. 111, 64 S. Ct. 851, 88 L.Ed. 1170, a case brought under the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., a companion piece of legislation, the Supreme Court in interpreting the term "employee" stated (322 U.S. at page 129, 64 S.Ct. at page 860): "That term, like other provisions, must be understood with reference to the purpose of the Act and the facts involved in the economic relationship. *'Where all the conditions of the relation require protection, protection ought to be given.'* " (Emphasis supplied.)

■ When the rule thus stated is applied to the issue presented in the instant case, it is difficult to see how the homeworkers here involved require the protection of the Act, or that the Act should be applied to them. The evidence discloses a marketing cooperative organized and operated by these ladies for the purpose of permitting them to sell to better advantage the products of their handicraft. In essence, the Cooperative exists to render services to its members; it receives the products produced by its members, sells the products for its members and distributes the net proceeds to its members as the articles submitted by them are sold. The record shows that the members are engaged, through the Cooperative, in a joint venture for the production and sale of hand-knit infants' outerwear, and that they are so engaged for their own mutual benefit, and not as employees employed by any one. Their *interests as members and producers are identical.* The work they perform is performed by them as members of the Cooperative, and not as its employees. Cf. Walling v. Plymouth Mfg. Corp., 7 Cir., 1943, 139 F.2d 178, certiorari denied, 1944, 322 U.S. 741, 64 S.Ct. 1144, 88 L. Ed. 1574.

■ The "economic reality" of the instant situation compels the conclusion that while these ladies work to produce their products, they do not work for the Cooperative, and neither does the Cooperative "suffer or permit" them to work. It has no connection with their labors. Rather, they, collectively, "suffer or permit" themselves individually to work. If the Fair Labor Standards Act be strained to recognize an employment relationship in these circumstances, such relationship can only be between these women as members and the same women as homeworkers. The Congress may wish in its legislative wisdom to declare that they so employ themselves. But in the opinion of this Court, the Act as written does not now so provide. This Court will not judicially legislate, whether it be urged to do so by homeworkers as in Mitchell v. Nutter, supra, or, as here, by the Department of Labor.

Judgment for the defendants, without costs.