## GOLDBERG, SECRETARY OF LABOR, *v.* WHITAKER HOUSE COOPERATIVE, INC., ET AL.

No. 274.  Argued March 30, 1961.—Decided April 24, 1961.

*Bessie Margolin* argued the cause for petitioner.  With her on the briefs were former *Solicitor General Rankin, Solicitor General Cox, Harold C. Nystrom, Charles Donahue* and *Sylvia S. Ellison.*

*Philip S. Bird* argued the cause for respondents.  With him on the brief was *Cyril M. Joly.*

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

Respondent cooperative was organized in 1957 under the laws of Maine; and we assume it was legally organized.  The question is whether it is an "employer" and its members are "employees" within the meaning of the Fair Labor Standards Act of 1938, § 3, 52 Stat. 1060, as

amended, 29 U. S. C. § 203. The question is raised by a suit filed under § 17 of the Act by petitioner to enjoin respondent from violating the provisions of the Act concerning minimum wages (§ 6), record-keeping (§ 11 (c)) and the regulation of industrial homework (§ 11 (d)). And see § 15 (a)(5). The District Court denied relief. 170 F. Supp. 743. The Court of Appeals affirmed by a divided vote. 275 F. 2d 362. The case is here on a petition for certiorari which we granted (364 U. S. 861) because of the importance of the problem in the administration of the Act.

The corporate purpose of the respondent as stated in its articles is to manufacture, sell, and deal in "knitted, crocheted, and embroidered goods of all kinds." It has a general manager and a few employees who engage in finishing work, i. e., trimming and packaging. There are some 200 members who work in their homes. A homeworker who desires to become a member buys from respondent a sample of the work she is supposed to do, copies the sample, and submits it to respondent. If the work is found to be satisfactory, the applicant can become a member by paying $3 and agreeing to the provisions of the articles and bylaws. Members were prohibited from furnishing others with articles of the kind dealt in by respondent.[1] They are required to remain members at least a year. They may, however, be expelled at any time by the board of directors if they violate any rules or regulations or if their work is substandard.[2] Members are not liable for respondent's debts; they may not be

---

[1] This provision of the bylaws was purportedly removed by a vote at the annual meeting of June 26, 1958, though a quorum was not present at the meeting. See *Mitchell* v. *Whitaker House Cooperative, Inc.*, 170 F. Supp., at 749, n. 7, 8; 751.

[2] An expulsion may be appealed by filing a petition "to be acted upon by the members at the next meeting." Cf. Me. Rev. Stat., c. 56, § 16.

assessed; each has one vote; their certificates are not transferrable; each member can own only one membership; no dividends or interest is payable on the certificate "except in the manner and limited amount" provided in the bylaws. The bylaws provide that "excess receipts" are to be applied (1) to writing off "preliminary expenses"; (2) to "necessary depreciation reserves"; (3) to the establishment of a "capital reserve." The balance may be used in the discretion of the board of directors "for patronage refunds which shall be distributed according to the percentage of work submitted to the Cooperative for sale." Members are paid every month or every other month for work submitted for sale on a rate-per-dozen basis. This payment is considered to be "an advance allowance" until there is a distribution of "excess receipts" to the members "on the basis of the amount of goods which each member has submitted to [respondent] for sale."

By § 11 (d) of the Act the Administrator is authorized to make "such regulations and orders regulating, restricting, or prohibiting industrial homework as are necessary or appropriate to prevent the circumvention or evasion of and to safeguard the minimum wage rate prescribed in this Act." Section 11 (d) was added in 1949 [3] and provides that "all existing regulations or orders of the Administrator relating to industrial homework are hereby continued in full force and effect."

These Regulations [4] provide that no industrial homework, such as respondent's members do, shall be done "in or about a home, apartment, tenement, or room in a residential establishment unless a special homework certificate" [5] has been issued. Respondent's members have no

---

[3] Fair Labor Standards Amendments of 1949, § 9, 63 Stat. 910, 916.

[4] See 29 CFR §§ 530.1–530.12.

[5] *Id.*, § 530.2.

such certificates; and the question for us is whether its operations are lawful without them and without compliance by respondent with the other provisions of the Act.

These Regulations have a long history. In 1939, shortly after the Act was passed, bills were introduced in the House to permit homeworkers to be employed at rates lower than the statutory minimum.[6] These amendments were rejected.[7] Thereupon the Administrator issued regulations governing homeworkers; [8] and we sustained some of them in *Gemsco, Inc.*, v. *Walling*, 324 U. S. 244, decided in 1945. In 1949 the House adopted an amendment which would have exempted from the Act a large group of homeworkers.[9] The Senate bill contained no such exemption; and the Conference Report rejected the exemption.[10] Instead, § 11 (d) was added, strengthening the authority of the Administrator to restrict or prohibit homework.[11] Still later respondent was organized; and, as we have said, it made no attempt to comply with these homework regulations.

We think we would be remiss, in light of this history, if we construed the Act loosely so as to permit this homework to be done in ways not permissible under the Regulations. By § 3 (d) of the Act an "employer" is any person acting "in the interest of an employer in relation to an employee." By § 3 (e) an "employee" is one "employed" by an employer. By § 3 (g) the term employ

---

[6] See H. R. Rep. No. 522, 76th Cong., 1st Sess., p. 10; 86 Cong. Rec. 4924, 5122.

[7] 86 Cong. Rec. 5499; see also the remarks of Mr. Zimmerman, *id.*, at 5136, and of Mr. Hook, *id.*, at 5224–5225.

[8] The Knitted Outerwear Wage Order, which covers the industry in which respondent is engaged, was issued April 4, 1942. See 7 Fed. Reg. 2592.

[9] 95 Cong. Rec. 11209–11210.

[10] H. R. Rep. No. 1453, 81st Cong., 1st Sess.

[11] 95 Cong. Rec. 14927.

"includes to·suffer or permit to work." We conclude that the members of this cooperative are employees within the meaning of the Act.

There is no reason in logic why these members may not be employees. There is nothing inherently inconsistent between the coexistence of a proprietary and an employment relationship. If members of a trade union bought stock in their corporate employer, they would not cease to be employees within the conception of this Act. For the corporation would "suffer or permit" them to work whether or not they owned one share of stock or none or many. We fail to see why a member of a cooperative may not also be an employee of the cooperative. In this case the members seem to us to be both "members" and "employees." It is the cooperative that is affording them "the opportunity to work, and paying them for it," to use the words of Judge Aldrich, dissenting below. 275 F. 2d, at 366. However immediate or remote their right to "excess receipts" may be,[12] they work in the same way as they would if they had an individual proprietor as their employer.[13] The members are not self-employed; nor are they independent, selling their products on the market for whatever price they can command. They are regimented under one organization, manufacturing what the organization desires and receiving the compensation the organization dictates.[14] Apart from formal differences,

---

[12] There has been no distribution of "excess receipts" to the members. The evidence is that respondent could survive "as a financially solvent enterprise only by doubling its present gross income." As of the date of the trial, respondent was in arrears even as respects what it owed its managerial employees. See 170 F. Supp., at 751.

[13] See *Mitchell* v. *Law,* 161 F. Supp. 795.

[14] When the cooperative desired to reduce its inventory and the rate of production of its members, it withheld the "advance allowances."

they are engaged in the same work they would be doing whatever the outlet for their products. The management fixes the piece rates at which they work; the management can expel them for substandard work or for failure to obey the regulations. The management, in other words, can hire or fire the homeworkers. Apart from the other considerations we have mentioned, these powers make the device of the cooperative too transparent to survive the statutory definition of "employ" and the Regulations governing homework. In short, if the "economic reality" rather than "technical concepts" is to be the test of employment (*United States* v. *Silk,* 331 U. S. 704, 713; *Rutherford Food Corp.* v. *McComb,* 331 U. S. 722, 729), these homeworkers are employees.

*Reversed.*

MR. JUSTICE WHITTAKER, with whom MR. JUSTICE BRENNAN and MR. JUSTICE STEWART join, dissenting.

It is clear and undisputed that the Fair Labor Standards Act does not apply in the absence of an employer-employee relationship. Here, upon what seems to me to be ample evidence, the District Court found that the cooperative was created and is being operated as a true cooperative under the laws of Maine, 170 F. Supp. 743, and, on appeal, the Court of Appeals approved those findings. 275 F. 2d 362. Unless those findings are clearly erroneous, they must be accepted here. Fed. Rules Civ. Proc., 52 (a), 28 U. S. C. Accepting them excludes any notion that the cooperative was formed or availed of as a "device" to circumvent the Act. It is not seriously contended here that these findings of the two courts below were "clearly erroneous," but rather the Government's principal contention is that the bona fides of the cooperative are immaterial.

Doubtless, even a true cooperative may have employees. But surely a true cooperative does not automatically become the "employer" of its "members" in the commonly understood sense of those terms, nor, hence, in their sense as used in subparagraphs (d) and (e) of § 3 of the Act, 29 U. S. C. § 203 (d) and (e). Something more is required. For the Act to apply, the cooperative must in a fair sense "employ" its "members." Like the two courts below, I think it may not fairly be said, on this record, that there is any evidence that the cooperative ever did "employ" its "members," or suffer or permit them to work *for it.* Instead, the evidence shows, as the two courts below found and as I read it, that each member worked for herself—in her own home when and as she chose—toward the production of knitted articles which she marketed through her cooperative, receiving immediately "an advance" thereon, and ultimately—after payment of her portion of the cooperative's "expenses" and setting up its "necessary depreciation [and capital] reserves"—the balance of the proceeds of sale would "be distributed [to her] according to the percentage of work [she] submitted to the Cooperative for sale." Like the two courts below, I fail to see in this any element of employment by the cooperative of its members.

If, as seems practically inevitable in the light of the Court's judgment, the cooperative must now be dissolved, will not its assets, including its "depreciation [and capital] reserves" as well as its "excess receipts," have to be refunded to its members "according to the percentage of work submitted [by them respectively] to the Cooperative for sale," and not according to their memberships or investments, just as required by the Maine statute and the cooperative's articles? This seems wholly inconsistent with any notion that the members were employees of the cooperative or that they were suffered to work *for it,* or that it bought or paid them for their knitted articles.

On the basis of the amply supported findings of the two courts below, it seems reasonably clear that the cooperative never did "employ" its "members," and inasmuch as the Act does not apply in the absence of an employment relationship, I think the judgment of the two courts below is consonant with the facts and the law and should be affirmed.