Arthur J. GOLDBERG, Secretary of Labor, United States Department of Labor

v.

**WARREN BROTHERS ROADS COMPANY.**

No. 7-52.

United States District Court
D. Maine, S. D.
July 9, 1962.

Thomas L. Thistle, Regional Attorney, U. S. Dept. of Labor, Albert H. Ross, Asst. Regional Atty., Boston, Mass., for plaintiff.

Roger A. Putnam, John A. Mitchell, Portland, Me., for defendant.

GIGNOUX, District Judge.

This action is brought under the Fair Labor Standards Act of 1938, as amended, 29 U.S.C.A. § 201 et seq., to enjoin violation of the overtime and record-keeping provisions of the Act. 29 U.S. C.A. §§ 207, 211(c), 215(a) (2) and (5), 217. The single issue presented is whether certain truckers whom defendant engages to transport materials used in its road-building operations are "em-

ployees" of defendant within the meaning of the Act, or whether they are independent contractors.[1] It is conceded that the truckers are engaged in interstate commerce or in the production of goods for interstate commerce, and that defendant has neither paid them overtime rates, nor maintained the records concerning them required by the Act.

Warren Brothers Roads Company is a Massachusetts corporation engaged in the production of bituminous concrete materials for the paving of roads and similar surfaces in the State of Maine and elsewhere. Its production of paving material is accomplished in Maine through a central office located in Benton, Maine, from which three mobile mixing plants are controlled. These plants are set up in various locations to service particular jobs during the six warm-weather months of the year. One of these mixing plants has been located at Benton, near the location of the central office, since 1946; the other two plants have been moved from area to area. At each plant site Warren Brothers hires trucks, each provided with a driver by the owner, to transport the hot top from the plant to the job location.

It is defendant's policy to hire trucks from people without regard to how many trucks they may own. During the years 1959 and 1960, defendant hired approximately one hundred trucks, approximately ten of which were supplied by owners of one truck, and ninety of which were supplied by owners of two or more trucks. Of those who owned only one truck, some drove it themselves; others hired someone else to drive it. Of those who owned *more* than one truck, some had two or more assigned simultaneously to defendant's jobs, others did not. Some of these multi-truck owners

drove on defendant's jobs or elsewhere; others did not drive at all. (Only those persons who rented one truck to defendant and drove it themselves are employees within plaintiff's contention.)

At any one time during the construction season, defendant would typically have several road jobs in progress. The number of hired trucks would range from ten to twenty for each job. At each plant location defendant would also have two of its own trucks, driven by its admitted employees and used for certain tasks for which defendant did not hire trucks from others and also for hauling hot top. While the majority of the trucks and drivers on each job would be newly hired from truckers in the area, the remainder would be trucks and drivers who moved from place to place to follow the plant within a reasonable distance from their homes.

The owners of all the hired trucks were paid weekly on an hourly or a per ton basis, the rate varying from job to job in accordance with oral arrangements negotiated with defendant's foreman at the start of each job. These arrangements were terminable by either party at any time, and the truckers could refuse a particular job if they did not like the price being offered by defendant. There was no agreement that the owner would provide a particular driver, but only that he would provide a competent driver; no helpers were involved. The owners were free to use their trucks elsewhere during the period in which they were dealing with defendant, and many of them did so. When not hauling for defendant, most of the truckers hired their trucks to other contractors, to the State or to a municipality and during the winter months utilized them in woods operations.

---

1. The relevant statutory provisions are as follows: 29 U.S.C.A. § 203:
  "As used in this chapter
  *　　*　　*　　*　　*
  "(d) 'Employer' includes any person acting directly or indirectly in the interest of an employer in relation to an employee * * *.

  "(e) 'Employee' includes any individual employed by an employer.
  *　　*　　*　　*　　*
  "(g) 'Employ' includes to suffer or permit to work."

The owners maintained their trucks on their own time and premises, paid their own operating expenses and provided their own consumable supplies, with the one exception of the diesel oil which was spread on the inside of the truck body prior to each loading. They insured the trucks and simply showed defendant the insurance certificates. The investment of an owner in a truck varied from approximately $2,500 to $3,500 and up. If a truck broke down while an hourly rate was applicable, payment was stopped if the interruption exceeded an hour or so. If defendant's mixer broke down, payment stopped and the truckers went home, unless there was stone to be hauled.[2]

The drivers of all the hired trucks were subject to the same degree of supervision and control by defendant's supervisory personnel. Defendant's plant foreman told the drivers what time to pick up the first load in the morning, where to deliver the loads during the day, and which was the last load at night, based upon the hours of mixer operation and the location of the job site. On occasional instances of manual unloading defendant's site foreman would direct the driver where to dump; generally, the drivers made a routine transfer to the paver. Each morning the drivers lined up at the mixer in the order in which they arrived, which generally set their order of loading for the day. By arriving early a driver had a chance to get an extra load in the course of the day. Defendant regulated neither speed nor route, and some drivers passed on the road and broke into line in order to get extra loads.

These truckers were thoroughly relaxed in the handling of their business matters. Generally, they rendered no bills, had no letterheads and did no advertising. Some kept track of their own hours or tons hauled, others left it to defendant. There was no specific arrangement concerning substitutes for the usual drivers. When an owner was ill or for any other reason was not to be driving himself, he generally let defendant's foreman know who would be driving, but no approval was required. Defendant paid the truck owner in any event. It did not deduct or withhold for the various employment taxes for any of the drivers, some of whom filed income and social security tax returns as self-employed persons.

As has been indicated, plaintiff's contention is limited to those persons who drove their own trucks on defendant's jobs.[3] In its answers to defendant's interrogatories, plaintiff originally named thirteen persons who were alleged to be within this category. Of the thirteen owner-operators whose names were so listed, plaintiff has waived its claim with respect to six, who plaintiff has stipulated were bona fide independent contractors for various reasons.[4] At the trial plaintiff presented the testimony of three of the remaining seven persons, contending that their testimony was representative of all seven of the owner-operators whose status is in issue.

■■■ The considerations relevant to a determination of the issue presented by this case are found in the leading Supreme Court decisions concerning the employment relationship under this Act and under the related Social Security Act. 42 U.S.C.A. § 301 et seq. They are Goldberg v. Whitaker House Coop., Inc., 366 U.S. 28, 81 S.Ct. 933, 6 L.Ed.2d 100 (1961); Rutherford Food Corp. v. Mc-

2. One of the drivers spent most of his time hauling crushed stone from the crusher to a stockpile within defendant's plant yard and was always paid upon an hourly rate. The overall characteristics of his operation are not such as to distinguish him from the other drivers, nor has plaintiff urged such a distinction.

3. Plaintiff's contention does not include owner-operators who leased a second truck or equivalent piece of equipment to defendant. It does include those who leased a second truck or piece of equipment to other persons.

4. It appears that four of these persons had never in fact driven on defendant's jobs during the period in question, and that of the remaining two, one had two trucks on defendant's jobs at one time. The record does not disclose the status of the other.

Comb, 331 U.S. 722, 67 S.Ct. 1473, 91 L.Ed. 1772 (1947); and United States v. Silk and Harrison v. Greyvan Lines, Inc., 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed. 1757 (1947) (one opinion).[5] These cases tell us that the primary consideration is effectuation of the purposes of the legislation, Silk at 713, 67 S.Ct. 1463; that the determination does not depend upon isolated factors but rather upon the circumstances of the whole activity, Rutherford 331 U.S. at 730, 67 S.Ct. 1473, 91 L.Ed. 1772; that it is a question of economic reality, Silk 331 U.S. at 713, 67 S.Ct. 1463, 91 L.Ed. 1757 and Whitaker House 366 U.S. at 33, 81 S.Ct. 933, 6 L.Ed.2d 100; and that the common law test of power to control how the work shall be done is but one factor in an overall determination. Silk 331 U.S. at 713–714, 67 S.Ct. 1463, 91 L.Ed. 1757. While they make it clear that no list of criteria is complete, Silk at 716, 67 S.Ct. 1463, six tests for determining whether or not an employment relationship exists are evident. They are: (1) the extent to which the services in question are an integral part of the "employer's" business; (2) the amount of the "employee's" investment in facilities and equipment; (3) the nature and degree of control retained or exercised by the "employer"; (4) the "employee's" opportunities for profit or loss; (5) the amount of initiative, skill, judgment or foresight required for the success of the claimed independent enterprise; and (6) the permanency and duration of the relationship. Mitchell v. Nutter, 161 F. Supp. 799, 805 (D.Me.1958). See Silk 331 U.S. at 716, 67 S.Ct. 1463 and Rutherford 331 U.S. at 729, 67 S.Ct. 1473, 91 L.Ed. 1772.

It is the view of this Court that the case at bar is controlled by United States v. Silk, supra, and the second case dealt with in the same opinion, Harrison v. Greyvan Lines, Inc., supra. Cf. Nat'l Van Lines Inc. v. N. L. R. B., 273 F.2d 402 (7th Cir. 1960) and Goldberg v. A. L. Bellotto, (Civil No. 4076, S.D.Fla., March 27, 1962). Silk involved truckmen who owned their own trucks and were engaged in making retail deliveries of coal from the defendant's coal yard at a uniform price per ton. The Greyvan truckmen also owned their own trucks and were engaged in transporting freight, largely household furniture, for the defendant common carrier at a percentage of the tariff charged by the company. Applying the above criteria, the Supreme Court held both groups of truckers to be independent contractors and not employees. Mr. Justice Reed, speaking for a majority of five Justices, stated the court's conclusion as follows:

" * * * where the arrangements leave the driver-owners so much responsibility for investment and management as here, they must be held to be independent contractors.[16] These driver-owners are small businessmen. They own their own trucks. They hire their own helpers. In one instance they haul for a single business, in the other for any customer. The distinction, though important, is not controlling. It is the total situation, including the risk undertaken, the control exercised, the opportunity for profit from sound management, that marks these driver-owners as independent contractors." 331 U.S. at 719, 67 S.Ct. 1463.

"16. Compare United States v. Mutual Trucking Co., 6 Cir., 141 F.2d 655; Glenn v. Standard Oil Co., 6 Cir., 148 F. 2d 51."

Upon a comparison of the facts in the instant case with those in Silk and Greyvan, this Court finds them substantially indistinguishable. As in those

5. While Silk and Greyvan deal with the employment relationship under the Social Security Act, Rutherford, which holds that certain meat-boners who worked in a slaughterhouse were employees under the Fair Labor Standards Act, makes it clear that cases defining the coverage of the employment relationship under the National Labor Relations and Social Security Acts are persuasive of a similar coverage under the Fair Labor Standards Act. 331 U.S. at 723, 67 S.Ct. 1463.

cases, while these truckers were from one standpoint an integral part of defendant's business, they were subject to no more control than was necessary to accomplish the results for which the trucks were hired. They had a sizeable investment in the trucks which they owned, they paid their own expenses, and their opportunities for profit and loss were to a substantial degree dependent upon their individual initiative, skill, judgment and foresight. Their relationship with defendant was essentially a transitory one. The record is replete with evidence of their independence; they rented their equipment to whoever paid the best price at the time, sometimes driving it themselves and sometimes hiring a driver. Perhaps most significantly, it is clear that these owner-operators operated under circumstances quite different from those of defendant's admitted employees. They performed different work and were subject to a minimum of control. Compare Tobin v. Anthony-Williams Mfg. Co., Inc., 196 F.2d 547 (8th Cir. 1952); Earle v. Babler, 180 F.2d 1016 (9th Cir. 1950); Mitchell v. Ry. Express Agency, 160 F. Supp. 628 (D.Me.1958) (Aldrich, D. J.). One must also conclude upon the entire record that the only difference between those who plaintiff contends are employees and those who it has stipulated are independent contractors is that the former rented defendant only one truck at one time. Silk and Greyvan make it clear that owner-operators of a single truck can be independent contractors under circumstances of independent operation.

In some respects the truckers in Silk and Greyvan, particularly those in Greyvan, were more closely integrated with the businesses there in question than were those in the case at bar. In Silk, the truckers collected and handled money for the company, and the company assumed responsibility for any damage caused by them. In Greyvan there were written contracts which required the truckers to haul exclusively for the company; to paint the name "Greyvan Lines" on their trucks; to collect moneys due the company and to post security therefor; to personally drive their trucks at all times, or to be present when a competent relief driver was driving (except in emergencies, when a substitute might be employed with the approval of the company); to obey the orders of the company's dispatchers with regard to their movements, and to report their positions at regular intervals; and to follow all rules, regulations and instructions of the company. The Greyvan truckers were members of a union, which was under contract with the company. They were required to take a course of instruction in the company's method of doing business, and a company manual purported to regulate in detail the performance of their duties. All permits, certificates and franchises were obtained at the company's expense, and insurance was carried under a blanket company policy, for which the truckers were charged proportionately. Finally, company trucks, driven by admitted company employees, were operated in the same manner as the trucks driven by the drivers in question.

Plaintiff places great emphasis on the purported distinctions that the Silk truckers could reject a job and that the Greyvan truckers hired helpers and made cross-country trips. Here, the truckers could reject a job also. Although no helpers were involved here, these owner-operators were not required to drive their trucks or to be present at all times, except in emergencies, as were the truckers in Greyvan. These owners were free to drive themselves or to send substitutes. The truckers in Silk made equally short hauls, and any inference of independent operation arising from the length of the trips in Greyvan is more than outweighed by the detailed manner in which those trips were supervised and controlled by the company.

The overall picture presented by the record in this case compels the conclusion that the status of the owner-operators in this case is not materially different from that of the truckers in Silk and

Greyvan. Like the drivers in Silk and Greyvan, these truckers are "small businessmen." Therefore this Court holds that the owner-operators involved in the present action are independent contractors, and not employees.

The Clerk is directed to enter judgment for the defendant