**W. Willard WIRTZ, Secretary of Labor, United States Department of Labor, Plaintiff,**

v.

**Ellis B. WRIGHTENBERRY, Individually, and d/b/a Wrightenberry Hosiery Mills, Defendant.**

No. C-97-G-62.

United States District Court
M. D. North Carolina,
Greensboro Division.
June 24, 1963.

Charles Donahue, Solicitor, Beverley R. Worrell, Regional Atty., William T. Truett, and Reuben S. Haslam, Attys., U. S. Dept. of Labor, Birmingham, Ala., for the plaintiff.

McLendon, Brim, Holderness & Brooks, Greensboro, N. C., for defendant.

EDWIN M. STANLEY, Chief Judge.

The plaintiff, W. Willard Wirtz, Secretary of Labor, United States Department of Labor, brings this action to restrain the defendant, Ellis B. Wrightenberry, individually and doing business as Wrightenberry Hosiery Mills, from violating certain provisions of the Fair Labor Standards Act of 1938, as amended, 29 U.S.C., § 201, et seq.

The defendant does not contest the allegation that he is engaged in commerce within the meaning of the Fair Labor Standards Act, but asserts that the individuals involved were not his employees within the meaning of said Act. The defendant further contends that if such individuals are found to have been his employees, any failure to comply with the provisions of the Act was unintentional.

The case was tried to the Court without a jury. Proposed findings of fact and conclusions of law and briefs of the parties having been received, the Court, after considering the pleadings, evidence, and briefs and requests of the parties, now makes and files herein its Findings of Fact and Conclusions of Law, separately stated.

## FINDINGS OF FACT

1. The plaintiff, Secretary of Labor, brings this action to restrain the defendant from violating Sections 15(a) (1), 15(a) (2) and 15(a) (5) of the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. § 201, et seq., hereinafter referred to as the Act. The provisions of the Act with respect to which plaintiff alleges violations by the defendant since October 13, 1960, are the minimum wage [Sections 6 and 15(a) (2)], overtime [Sections 7 and 15(a) (2)], recordkeeping [Sections 11(c), 11(d), regula-

tions issued pursuant to the Act and Section 15(a) (5)], and the shipping provisions [Section 15(a) (1)].

2. The defendant, Ellis B. Wrightenberry, resides, and at all times pertinent has resided, in Burlington, Alamance County, North Carolina, within the jurisdiction of this Court.

3. The defendant is, and at all times pertinent was, the owner and operator of a place of business in Graham, Alamance County, North Carolina, where he is and has been engaged in purchasing, processing and distributing men's and children's half hose under the name and style of Wrightenberry Hosiery Mills.

4. The defendant occupies a two-story building in Graham, North Carolina, containing approximately 5,000 square feet, in connection with the operation of said business. When hose are completely processed, substantial portions are, and have been, regularly shipped, delivered and sold to customers outside the State of North Carolina.

5. In purchasing and processing hose, the defendant, at all times pertinent, purchased hose in the greige from hosiery manufacturers located in North Carolina. Approximately 90% of the hose were third grade, and approximately 10% were seconds and firsts. When the hose were received from the suppliers at the defendant's plant, the cartons were opened and spot checked to determine whether the merchandise received was as expected and whether the shipment included waste. The third-grade socks were then turned over to women to be worked in their homes. In some cases, the hose were delivered to and picked up at the homeworkers' residences by defendant's truck, and in other instances the pick-ups and deliveries were made by the homeworkers. The merchandise was delivered and picked up in batches contained in large cartons. The homeworkers sorted and turned the socks as necessary, sewed up the holes, sewed together the toes, clipped loose strings, re-turned them, bundled them by dozens, and then returned them to the defendant's plant. The defendant thereafter dyed or bleached, boarded, paired, folded, inspected, sorted and otherwise prepared the hose for marketing. Some of the same kind of seaming and mending was also done in the defendant's plant by one or two of his regular employees.

6. To do their work for the defendant, the homeworkers purchased used machines known as seamers. The machines were generally obsolete and depreciated, and the cost to the homeworkers ranged from $105.00 to $175.00. Some machines were bought from or through the defendant. The homeworkers usually got thread for the work from the defendant, although in some instances they purchased it from other sources.

7. The homeworkers performed their work in living rooms, bedrooms, and other convenient parts of their homes. The machines were small and took approximately the same amount of space to operate as required by an ordinary home sewing machine. Some of the homeworkers were frequently assisted in handling, sorting, turning, and delivering hose to the defendant by their husbands and other members of their families. All of their work was routine and repetitive. It was the kind of work generally performed, and capable of being performed, on an assembly line in an industrial plant.

8. At the outset of his dealings with the various homeworkers, the defendant, or his representatives, instructed the homeworkers generally how the work was to be accomplished, and set the price per dozen to be paid by the defendant for the work on the various grades and types of hose involved. The rates varied from 15¢ per dozen to 35¢ per dozen, and these rates were designed to enable the homeworkers "to make a fair salary." There was no immediate supervision of the work in the homes, nor was such supervision necessary to the desired end. There was no opportunity for profit or loss by the homeworkers, only such wages as their work produced.

9. All the homeworkers in question were ladies, usually housewives desirous of supplementing their family income.

Some of them performed work for other mills, but generally they only worked for one mill at a time. None of the homeworkers operated under business names, nor did they advertise, bid, or negotiate on the work in question. They kept on scraps of paper, or on cards furnished by the defendant, the number of dozens of hose they sewed. Title to the hose remained in the defendant throughout the operation, and he controlled the flow of the work to suit his inventory and sales needs.

10. When the socks were returned by the homeworkers to the defendant's plant, a check was issued on the basis of the number of dozens processed multiplied by the fixed rate per dozen. A slip of paper was usually placed on the outside of the bundle showing the number of dozens processed and the applicable piece rate, and from this information the amount of the check was determined. The amounts of these payments were carried on the defendant's books as outside labor.

11. The defendant did not own any of the equipment used by the homeworkers in the performance of their work. Neither did the defendant pay any part of the cost of the ultilities or rent for the homes.

12. From October 13, 1960, through December, 1962, the period covered by the complaint, thirty-one different women performed the described work on defendant's hose in their homes. The complaint in this action was filed on May 15, 1962. During the latter part of December, 1962, after notice of a pre-trial setting of this action, the defendant discontinued the use of homeworkers and brought all of his operations into his plant.

13. With respect to the work processed by the homeworkers, the defendant kept records which purported to include the number of dozens in each batch, rates per dozen, number of hours worked, and the amount paid. Some of the homeworkers did not report hours worked at all, but defendant's records still purported to show this information.

Generally, those who did report did not include time spent in sorting, turning and other similar activities, but limited their reports to the time spent in sewing. Even this time was usually estimated. No report or record was made of the time spent in picking up and delivering hose, or the time spent by members of the families who helped the homeworkers. Where more than 40 hours were spent by the homeworkers on a batch of hose, the records of the defendant do not show whether such hours occurred in one or more weeks. No overtime rates were reflected in the defendant's records.

14. The amounts paid the homeworkers, when divided by the hours recorded by the defendant, generally approximated $1.00 per hour before September 3, 1961, and $1.15 per hour thereafter. Some of the homeworkers made rough calculations and so reported their hours to achieve the desired result. Some believed they were expected to do this, and in a few instances they were advised to report in this manner by the defendant or his representative. The same was true with respect to reporting sewing time only. Generally, the records maintained by the defendant are so inadequate and incomplete that they bear little resemblance to the hours actually spent by the homeworkers on defendant's business.

15. Due to the incompleteness of the records maintained by the defendant, and the fact that many of the records maintained constitute nothing more than estimates, and due to the further fact that no attempt was made to record the time spent in all phases of processing hose, it is difficult to determine which of the homeworkers, if any, were actually paid the minimum wage prescribed by the Act. The services performed by some of the homeworkers could have yielded them as much as $1.00 per hour before September 3, 1961, and $1.15 per hour thereafter. However, it is clear that many of the homeworkers did not produce enough to equal the minimum wage, particularly

if the time spent in sorting, turning, bundling, clipping, picking up and delivering is counted. Several hours were spent on these services in connection with each batch of hose obtained by the homeworkers. The inadequate records also make it difficult, if not impossible, to determine whether some of the workers should have been paid extra one-half time compensation for work in excess of forty hours per week.

16. The defendant has been investigated by the Department of Labor on three occasions. Each time his responsibilities under the Act were explained and discussed. At the conclusion of a May, 1958, investigation, the defendant was told by the investigator that homeworkers, such as those here involved, were employees, and had not been paid in accordance with the Act, and that the defendant's records of time and pay were inadequate under the applicable regulations. The investigator explained to the defendant all compliance procedures. The defendant admitted to the investigator that some of the homeworkers could not make the minimum wage at the piece rates being paid, and stated that he would have to go out of business if compliance with the Act was enforced. He also took the position that the homeworkers were not employees and that he was not liable for the minimum wage. Following the investigation, the defendant wrote the United States Department of Labor in Washington and requested a ruling as to how the homeworkers should be classified. He stated only briefly and generally how the homeworkers operated. The answer was also general, pointing out that "generally a person working in his home on goods for a hosiery company is an employee of that company even though he may own his own machines and even though he may use additional help to perform the work." The reply also pointed out that the term "employee," as used in the Act, was "broader" than the term as used in many other laws. It was then suggested that if the defendant desired more detailed information, he could contact local officials. Following this exchange of letters, the defendant advised that he was complying with the Act.

17. In October, 1960, the Department of Labor made another investigation of the defendant's business. At the conclusion of the investigation, the defendant was told that he appeared to be in general compliance with the pay requirements of the Act, but that his records with respect to hours worked should be kept more accurately, and that the number of hours worked per week should be clearly shown so that over-time responsibility could be determined. The defendant agreed to follow the suggested procedure. Following this investigation, the defendant applied to the United States Department of Labor for a supply of Homeworkers Handbooks, and on November 23, 1960, received 90 copies. Copies of the handbook were thereafter furnished the homeworkers, with instructions as to how they should be kept. The defendant also commenced the use of individual cards which provided spaces for recording the number of hours worked each day during a work week, and the number of dozens of hose processed each day. The card also provided for the signature of the homeworker over a certification "that the above hours and dozens are correct for the pay period shown." As earlier noted, these cards and handbooks, while adequate with respect to the information called for, seldom reflected the hours actually worked since many services performed in processing the hose were not included.

18. A third inspection of the defendant's business was made in August, 1961, following which the defendant was advised that he was not complying with the record-keeping and minimum pay requirements of the Act with respect to the homeworkers. The defendant indicated to the inspector that he intended to discontinue the use of homeworkers and to process all merchandise in his plant. A further check by the inspector in March, 1962, showed that the same practices continued. This action was commenced shortly thereafter.

19. On August 18, 1961, the defendant made an anonymous inquiry, through an attorney, to the United States Department of Labor in Washington for their view in regard to the employment relationship of homeworkers to the defendant. The Department of Labor responded on September 8, 1961, stating there were not sufficient facts in the inquiry to enable the Department to express an opinion as to whether the homeworkers were employees or independent contractors. It pointed out that the nature of the relationship depended "upon the economic realities of the whole activity as disclosed by all the surrounding circumstances," and that "a definition of 'employer-employee relationship' under one Federal law would not necessarily apply under a different Federal law." It was then suggested that local officials be contacted for further information.

20. The defendant also had considerable correspondence in 1958 and 1961 with the Treasury Department concerning his employment relationship with the homeworkers. He was advised that homeworkers were not employees under the Social Security Act. It had, however, been pointed out to the defendant on several occasions that he should not look beyond the Fair Labor Standards Act for a determination of this relationship.

21. At all times pertinent, regulations, 29 CFR 516, were duly promulgated and in effect under Section 11(c) of the Act with respect to records required to be kept. Among other things required by those regulations was an accurate record of the hours worked by employees subject to the Act.

## DISCUSSION

The first question for determination is whether the homeworkers were employees of the defendant within the meaning of the Act. If this question is determined favorably to the plaintiff, it will then become necessary to determine whether the defendant has violated the minimum wage, overtime, and record keeping requirements of the Act with respect to the homeworkers involved, and whether the plaintiff is entitled to an injunction. There is no question but that the homeworkers produced goods for commerce within the meaning of the Act.

With respect to the status of the homeworkers, the evidence clearly established that they were employees and not independent contractors. Their work was an integral part of the defendant's manufacturing process. The defendant controlled what homeworkers would obtain hose for processing, and set the piece rate to be paid for the work. There was no opportunity for profit or loss, only the privilege of receiving the piece rate set by the defendant, which frequently did not meet the minimum wage standard. The work was repetitive and routine, with only manual dexterity and little judgment on the part of the homeworkers involved. Some of the workers had little or no previous experience in performing this type of work. Certainly, the work performed by the homeworkers here involved required less skill and independent judgment than the homeworkers in Walling v. American Needlecrafts, 6 Cir., 139 F.2d 60 (1943), and in Goldberg v. Whitaker House Coop., 366 U.S. 28, 81 S.Ct. 933, 6 L.Ed. 2d 100 (1961). There is no material difference in the type of work performed by defendant's homeworkers and the type of work performed by the homeworkers in McComb v. Homeworkers' Handicraft Cooperative, 4 Cir., 176 F.2d 633 (1949).

The evidence further clearly establishes that the defendant did not meet the record-keeping and monetary requirements of the Act. During most of the period in question, the defendant furnished the homeworkers with adequate forms for maintaining accurate records, but these forms seldom reflected accurate information with respect to the hours worked or the hourly rate of pay. In a number of instances the *sewing* time was estimated so as to make the hours shown on the

records, when multiplied by the dozens of hose processed, equal the minimum wage. However, the homeworkers were not only entitled to be paid the minimum wage for their *sewing* time, but were also entitled to have included the time spent in preparing the work by turning, sorting, bundling and clipping. All such work was clearly an integral and indispensable part of the processing operation. In many instances, members of the family helped the homeworkers, and no record of this time was ever kept or reported. The inadequacy and incompleteness of the records, many of which constitute nothing more than estimates, and some of which do not even purport to include *all* hours actually spent in processing the hose, render it difficult, if not impossible to determine which of the homeworkers, if any, were actually paid the minimum wage prescribed by the Act. The same is true with respect to extra one-half time compensation for work in excess of 40 hours per week. However, as earlier stated, it is abundantly clear from the testimony of the witnesses that many homeworkers were not paid the minimum wage, due to the fact that all compensable hours spent in processing defendant's hose were not recorded. When the violations were called to the attention of the defendant, the usual reaction was an attempt to establish that the homeworkers were independent contractors. The inescapable conclusion is that the defendant never made a bona fide attempt to comply with either the record-keeping or monetary provisions of the Act.

■■■ The only question remaining for decision is whether the plaintiff is entitled to an injunction. Section 17 of the Act provides that "The district courts * * * shall have jurisdiction, for cause shown, to restrain violations of Section 15 * * *" of the Act. 29 U.S.C. § 217. Section 15 of the Act is the section which makes it unlawful to violate, among other things, the record-keeping, minimum wage and shipping provisions of the Act. 29 U.S.C. § 215.

This statutory remedy is, of course, equitable in nature, and its use, even when violations, are found, is discretionary. However, the discretion is sound judicial discretion and is subject to certain firm limitations. Some of the factors to be considered in determining whether an injunction should issue are set out in Mitchell v. Hausman, 5 Cir., 261 F.2d 778 (1958) and Goldberg v. Cockrell, 5 Cir., 303 F.2d 811 (1962). In both of these cases, the denial of injunctive relief by the district court was reversed. In the Cockrell case, the Court, 303 F.2d at page 814, stated:

"The need for injunctive relief is to be measured by the employer's approach and attitude *as demonstrated by his previous actions of non-compliance*, not by his pious promises to comply in the future under the threat of judicial compulsion."

The defendant urges that the injunction should be withheld because (1) his reliance on Treasury Department rulings that homeworkers were not employees within the meaning of the Social Security Act and (2) his discontinuance of the employment of homeworkers at the end of 1962. The answer to this argument is that on three occasions, dating from 1958, the defendant was advised by representatives from the Department of Labor that the homeworkers were his employees within the meaning of the Act, and that compliance with the record-keeping and minimum wage provisions of the Act was necesssary. Procedures for compliance were fully explained. While the defendant disagreed with the investigators as to the status of the homeworkers, he nevertheless promised compliance. In response to inquiries from the Department of Labor in Washington, the defendant was advised on at least two occasions that he should look only to the Fair Labor Standards Act to determine the status of his homeworkers, as the term "employee" under that Act was broader than in most other statutes. There is no explanation whatever why

the defendant felt justified in relying on the rulings of the Treasury Department. This agency was not concerned with the administration of the Fair Labor Standards Act, a fact well known to the defendant.

After three futile attempts to obtain compliance, this action was instituted. When the trial was imminent, the defendant discontinued the use of homeworkers and brought all of his operations into his plant. He now states that he has no intention of resuming the practice in the future. However, there is no practical or legal prohibition against the resumption of the use of homeworkers practice. Having chosen to engage in litigation after receiving ample instructions with respect to his responsibility under the Act, and then having abandoned the employment of homeworkers only after trial was imminent, leaves the Court with no alternative, in the exercise of sound judicial discretion, other than to grant injunctive relief. The cases cited by the defendant have been examined and found to be factually distinguishable. As is set out in Goldberg v. Cockrell, supra, an injunction does not subject an employer to any penalty for his past violations of the law, but merely requires future compliance and "shifts the responsibility for compliance onto the employer's shoulders."

## CONCLUSIONS OF LAW

1. The Court has jurisdiction of the parties and the subject matter herein.

2. The homeworkers referred to were employees of the defendant, and were engaged in the production of goods for commerce, within the meaning of the Act.

3. The defendant repeatedly failed to pay the homeworkers minimum wages required by Sections 6 and 7 of the Act, and repeatedly failed to make, keep and preserve adequate and accurate records required by regulations issued pursuant to Section 11(c) of the Act.

4. The injunction prayed for should issue.