W. Willard WIRTZ, Secretary of Labor, United States Department of Labor,

v.

MANCHESTER SAND, GRAVEL & CEMENT CO., Inc., Manchester Paving Company, Inc., Parker H. Rice and John H. Rice.

Civ. A. 2300.

United States District Court
D. New Hampshire.
Sept. 28, 1964.

Thomas L. Thistle, S. Anthony diCiero, Austin N. Horowitz, Albert H. Ross, Boston, Mass., for plaintiff.

Devine, Millimet & McDonough by Joseph A. Millimet and John S. Holland, Manchester, N. H., for defendants.

CONNOR, District Judge.

This is a suit to enjoin the defendant corporations from violating the provisions of Sections 15(a) (1), 15(a) (2), and 15(a) (5) of the Fair Labor Standards Act of 1938 (52 Stat. 1060, as amended; 29 U.S.C. § 201 et seq.), hereinafter called the Act. Upon the close of all the evidence, the defendants made an oral motion to dismiss, on the ground that the truckers here involved were not "employees" within the meaning of the Act. It was the understanding of the parties at that time that if this motion were denied, both parties would be free to furnish additional memoranda relative to the ultimate disposition of the case.

The Manchester Paving Company is in a measure a successor of the Manchester Sand, Gravel & Cement Company in that it now does the road construction work formerly performed by the latter. Although there is no common ownership of stock in the two corporations, the chief stockholder of the latter is the father of the seventy-five per cent stockholder of the former.

The truckers with respect to which the plaintiff herein seeks an injunction against the companies, are chiefly engaged in hauling aggregate from the yard of Manchester Sand, Gravel & Cement Company to the customers of that company; they also do some trucking for Manchester Paving Company.

Seven persons testified at the trial: five truckers, Parker Rice (chief shareholder in Manchester Sand, Gravel & Cement Company), and John Rice (75% shareholder in Manchester Paving Company). From their testimony, I find the facts to be as follows:

The truckers herein involved each owned their own trucks, purchased new or used upon the expectation of receiving a substantial amount of work from either or both of the companies here named as defendants. The companies did not finance the purchase of these trucks; it was not unusual, however, for the companies to attach a skirt, spreader, or other device to them. Maintenance, insurance, and all other costs of running the trucks were borne by the individual operators; such costs equalled about half of their gross earnings.

The pattern of work hours of the truckers at Manchester Sand, Gravel & Cement Company appears to have been determined largely by the foreman of that company's yard. It was normally expected that the truckers would arrive at 7:00 a. m. and be available for work until 4:30 p. m. Saturday work was not unusual; and the total hours worked per week for either or both companies often ran as high as fifty. They were usually paid according to a tonnage-mile schedule and not on an hourly basis. It was unusual for a trucker to refuse a load because of the price, but it did occasionally occur. They were not paid for waiting time or for any incidental chores performed at the company's yard. Job assignments for hauling from the yard were generally on a "first come, first served" basis, although the foreman had his favorites. The number of trips made each day by any one trucker depended upon the rate of business and the length of the trips. The length of the trips varied from a few miles to considerable distances; and return loads were a rarity. The route to be travelled

in reaching a destination was suggested, but not prescribed by the companies.

The truckers were nominally free to accept outside hauling jobs, to come and go at will, and to quit at any time. More realistically, the foreman managed to maintain discipline over the truckers by his control of the job assignments. Truckers who took a day or two off for another job could expect to be "benched" for a half day or a day upon their return. Likewise, those who reported "late" in the morning, or otherwise incurred the disfavor of the foreman, could expect to spend a longer time at the end of the waiting line than would otherwise be the case. It also appears that the foreman was able to get the truckers to perform occasional odd chores such as sweeping the scale area and the truckers' quarters.

The truckers seldom, if ever, rendered any bills for their work. They were paid each Thursday, out of a special company account, for the tonnage they had hauled during the preceding week. There was no withholding for either Social Security or income taxes. Annual earnings from company work ranged anywhere from a few hundred dollars to fifteen thousand dollars. The latter figure would indicate that the trucker involved owned two or possibly three trucks. The maximum earnings per week by a trucker with only one truck would probably not exceed three hundred dollars. Hauling for the company was a seasonal occupation. During the winter, the truckers might earn substantial sums plowing snow.

The truckers maintained no private offices or staff of their own. Although they were free to accept work from any source, it was usual for them to call the company foreman if they were not coming in on a particular day due to illness, other business, etc. The truckers did not have the name of the company on the outside of their trucks; nor did they solicit business or do collection work for the company. Their job was simply to deliver to the customer. By doing small favors for a customer, they might hope that the customer would request their services from the company again; such customer requests were usually honored by the company.

In the last ten years, Manchester Sand, Gravel & Cement Company has employed approximately three hundred individual truckers on this basis. Most of these truckers have owned only a single truck at one time. Each year anywhere from fifteen to thirty truckers are so employed. These truckers account for thirty per cent or less of all the company's outside hauling to customers. Fifty per cent goes by rail, and the remaining twenty per cent is picked up by customers in their own trucks. The company does not make a profit on the hauling by the truckers in question; it merely adds the cost of the hauling to the customer's bill. The customer demand for such hauling fluctuates sharply. In addition, the company has its own trucks to do hauling on the company premises; these trucks are operated by admitted employees of the company.

John Rice, son of Parker Rice, established that the practices of the Manchester Paving Company were similar to those of Manchester Sand, Gravel & Cement Company. A much higher percentage of the trucks hired by Manchester Paving Company, however, are fleet-owned trucks; in the case of such fleet-owned trucks, the company pays the owner and the owner, in turn, pays the individual driver. The company also had its own trucks with its name on the outside; these trucks were driven by its own employees.

The foreman for Manchester Sand, Gravel & Cement Company served as a clearing house for work requests not only from his own company, but for Manchester Paving Company and outsiders, as well. Thus the truckers here in question often shuttled back and forth between companies or went on outside jobs, on the basis of the information gathered and disbursed by this foreman.

Having determined the facts to be as described above, I am of the opinion that the facts of the present case are substantially similar to those in United States v. Silk, 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed. 1757 (1947); and that if any significant difference between that case and this is to be noted, it is that the facts of Silk are more conducive to the establishment of an employee status than the facts presented here. Upon the authority of Silk, I am constrained to grant the defendants' motion. Cf. also Goldberg v. Warren Brothers Roads Company, 207 F.Supp. 99 (D.C.1962).

It is hereby ordered that the action be, and the same hereby is, dismissed.