**BUILDERS COMMONWEALTH, INC., Relator,**

v.

**DEPARTMENT OF EMPLOYMENT AND ECONOMIC DEVELOPMENT, Respondent.**

**No. A11–1307.**

Court of Appeals of Minnesota.

May 7, 2012.

Michael E. Orman, Larry Nord, Orman Nord & Hurd P.L.L.P., Duluth, MN, for relator.

Lee B. Nelson, Amy R. Lawler, Department of Employment and Economic Development, St. Paul, MN, for respondent department.

Considered and decided by CLEARY, Presiding Judge; KLAPHAKE, Judge; and HARTEN, Judge.*

## OPINION

CLEARY, Judge.

Relator Builders Commonwealth, Inc. filed a petition for writ of certiorari, seeking review of the decision by an unemployment-law judge (ULJ) that relator's members are employees of relator and that relator is an employer pursuant to Minnesota unemployment-insurance law, obligating relator to pay unemployment-insurance taxes. Relator maintains that its members are not employees, but rather are self-employed. Further, relator argues that determination of the status of relator and its members is precluded by a previous decision. We affirm.

## FACTS

Relator is a cooperative association that was formed in 1978 and operates out of Duluth, Minnesota. According to its articles of incorporation, the purpose of relator is

> to provide work and income for its members in a manner which will permit them, individually and in concert with each other, on a cooperative basis, to employ their skills, talents and labor in the construction, maintenance, renovation and repair of buildings and other structures, and to supply and furnish to its members and patrons, on a cooperative basis, supplies, commodities and property; and to engage in and carry on any other lawful activity which may be incidental thereto or conveniently conducted in conjunction therewith as a worker's cooperative.

Relator admits members into the cooperative, and its membership agreement contains the following relevant language:

> 1. All members are engaged, through the cooperative, in a joint venture and mutual effort on a cooperative basis in the construction, maintenance, and renovation and repair of buildings and other structures, the construction of custom cabinetry and other custom woodworking projects.
>
> 2. My interest as a member and producer will be identical.
>
> 3. All members share the losses as well as the revenues of the association on a prorata basis according to work contributed and that the work value of members may, but need not be equal.
>
> 4. Work performed by me will be as a member and not as an employee of the cooperative.
>
> 5. Advances of money, or property made to me by the association out of estimated or actual revenues of the association during any fiscal accounting period of the association ... shall constitute advance payments of my share of the association revenues, in the nature of loans, as a set-off against my share of the association earnings. Any balance due me will be paid to me as a patronage dividend after the close of said fiscal year of the association.... In the event that said advances during any fiscal year shall exceed the share of the association revenues to which I am entitled, I agree that I will repay such excess to the association at the times and in the manner as the Board of Directors of the association shall determine.

A page attached to the membership agreements states, "I, a self-employed member

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to

Minn. Const. art. VI, § 10.

of [relator], understand fully that as a self-employed individual, it is my responsibility to provide for myself any and all health/medical and disability insurance coverage." Members pay self-employment tax.

All members of relator are voting members, and each member has one vote in matters submitted to a vote at member meetings. Member meetings are held at least quarterly. Members elect relator's board of directors from among the members.

Relator has a personnel committee, to which members may be elected. The personnel committee conducts annual reviews of members and their performance; sets advance rates for members; decides whether to grant leaves of absence; deals with grievances and disciplinary issues; reviews prospective new members and offers membership; and is responsible for hiring, lay-offs, demotion, and dismissal.

Members work both in a large shop that relator owns and in the field on job sites. Members use their own vehicles to get to job sites, and supply their own tools for their work. If members work on jobs located more than 75 miles from relator's offices, they receive extra compensation and are reimbursed for reasonable hotel expenses. If possible, members must give a manager at least two weeks' notice before taking time off. During the period of membership, a member may not solicit or accept employment by, or render professional services to, a person or organization, except for family members, within a 75 mile radius of relator's offices.

A shop manager sets up work crews and designates project leaders for shop projects, while a scheduler sets up crews and designates coordinators for site jobs. For each site job, there is a site coordinator who coordinates subcontractors and makes sure work is done in a workman-like fashion. Members apply to be coordinators and are selected for the position by the personnel committee. A coordinator has the right to expel a member from a job site for nonperformance. The incident is then reported to the personnel committee, which may adjust the member's advance rate, put the member on probation, or initiate the process of terminating membership.

Members receive compensation in two ways. First, members receive "advances" by being paid an hourly rate for work performed. Members must fill out time-cards and submit them to relator's office on a weekly basis. The category of "Advance Draws Paid to Members" is listed as an asset on relator's monthly balance sheet. Second, at the end of the fiscal year, members may receive distributions, called "patronage distributions," "patronage refunds," or "patronage dividends," if relator has been profitable. The amount of the distribution a member receives is determined by relator's executive committee, and is based on the labor or services performed or business done by the member. Conversely, if relator lost money during the fiscal year, members are required to pay a certain amount back to relator, the amount being based on each member's labor, services, or business.

Members may withdraw their membership and leave relator by giving two weeks' written notice. During the first year of membership, a new member may be expelled and required to surrender membership by a unanimous vote of the personnel committee, with input from members. After the first year of membership, any member who knowingly, intentionally, or repeatedly violates a provision of relator's bylaws may, after a two-thirds vote of the members, be required by the board of directors to surrender membership and be expelled from relator.

In July 1991, a representative of the commissioner of Minnesota Department of Jobs and Training (MDJT)[1] decided that there was no employer-employee relationship between relator and Bruce Ripley, one of its members, and that remuneration paid to Ripley by relator did not constitute wages under Minnesota jobs and training law for unemployment tax and benefit purposes. This decision reversed an unemployment-insurance judge who, following a hearing, had apparently determined that Ripley was an employee of relator.

In December 2010, respondent Minnesota Department of Employment and Economic Development sent relator a notice stating that, effective January 1, 2006, relator is an employer subject to Minnesota unemployment-insurance law. Respondent requested quarterly wage detail reports and unemployment-insurance taxes from relator for 2006 through 2010.

Relator appealed, and a telephone evidentiary hearing was held by a ULJ. During the hearing, relator argued that the employee-employer status issue had already been determined in 1991, and that collateral estoppel precludes relitigation of this issue. The ULJ subsequently issued a decision holding that relator's members are employees of relator, that relator is an employer pursuant to Minnesota unemployment-insurance law, and that relator is therefore required to pay unemployment-insurance taxes for 2006 through 2010. The ULJ found that the evidence showed that members work under essentially the same conditions as employees in that they are paid by the hour at an hourly rate set by relator; relator has the right to control the means and manner of performance of the members; relator has the right to discharge members with a two-thirds vote without incurring liability; members pro-vide services that are in the course of the business of relator; and members have a continuing relationship with relator. The ULJ also determined that collateral estoppel did not preclude his decision because the member involved in the case in 1991, Ripley, is not a party now and because "the law relating to whether a worker in the construction industry is an employee has changed significantly since 1991."

Relator requested reconsideration of the ULJ's decision and the ULJ affirmed on reconsideration. In the reconsideration order, the ULJ further stated that members are compensated for their services and that this compensation constitutes wages. The ULJ also reiterated that the evidence showed that relator has the right to discharge members with a two-thirds vote. This certiorari appeal followed.

### ISSUES

I. Did the ULJ err in holding that determination of the status of relator and its members is not precluded by the 1991 decision of the MDJT?

II. Did the ULJ err in holding that relator's members are employees, and that relator is an employer, pursuant to Minnesota unemployment-insurance law?

### ANALYSIS

**I. Did the ULJ err in holding that determination of the status of relator and its members is not precluded by the 1991 decision of the MDJT?**

Relator argues that respondent and the ULJ's determinations of the status of relator and its members were precluded by the 1991 decision of the MDJT. "Whether collateral estoppel is available is

---

1. Currently, "Department" is defined as "the Department of Employment and Economic Development." Minn.Stat. § 268.035, subd. 12a (2010).

a mixed question of law and fact subject to de novo review." *In re Trusts Created by Hormel*, 504 N.W.2d 505, 509 (Minn.App. 1993), *review denied* (Minn. Oct. 19, 1993).

 Collateral estoppel may apply to administrative decisions when an agency acts in a judicial or quasi-judicial capacity. *Graham v. Special Sch. Dist. No. 1*, 472 N.W.2d 114, 115–16 (Minn.1991).

> In order for a court to apply collateral estoppel to an agency decision, five factors must be met:
>
> 1. the issue to be precluded must be identical to the issue raised in the prior agency adjudication;
>
> 2. the issue must have been necessary to the agency adjudication and properly before the agency;
>
> 3. the agency determination must be a final adjudication subject to judicial review;
>
> 4. the estopped party was a party or in privity with a party to the prior agency determination;
>
> 5. the estopped party was given a full and fair opportunity to be heard on the adjudicated issue.

*Falgren v. State, Bd. of Teaching*, 545 N.W.2d 901, 905 (Minn.1996) (citing *Graham*, 472 N.W.2d at 116). Collateral estoppel is not rigidly applied. *Johnson v. Consol. Freightways, Inc.*, 420 N.W.2d 608, 613 (Minn.1988). "As a flexible doctrine, the focus is on whether its application would work an injustice on the party against whom estoppel is urged." *Id.* at 613–14.

Minn.Stat. § 268.105, subd. 5a (2010), is entitled, "No collateral estoppel," and states:

> No findings of fact or decision or order issued by an *unemployment law judge* may be held conclusive or binding or used as evidence in any separate or subsequent action in any other forum, be it contractual, administrative, or judicial, except proceedings provided for under this chapter, regardless of whether the action involves the same or related parties or involves the same facts.

(Emphasis added.) Respondent argues that this subdivision controls this issue and prevents the application of collateral estoppel. However, the 1991 decision that there was no employer-employee relationship between relator and Ripley was made by a representative of the commissioner of the MDJT, not by a judge. The unemployment-insurance judge's determination of employer-employee status was reversed by the MDJT. This subdivision is not directly on point in this matter.

In *Clapper v. Budget Oil Co.*, this court refused to give preclusive effect to the determination by a referee with the MDJT that an individual had quit employment without good cause attributable to the employer in a subsequent wrongful-termination lawsuit. 437 N.W.2d 722 (Minn. App.1989), *review denied* (Minn. June 9, 1989). We determined that the agency hearing did not afford a full and fair opportunity to be heard because it was informal in nature; not bound by common law or statutory rules of evidence and procedure; representation of a claimant by an attorney was subject to oversight; and there was no provision for juries. *Id.* at 726. We stated, "The emphasis at the hearing is on the speedy resolution of a claim. We conclude that the nature of such a hearing does not constitute a full and fair opportunity to be heard for purposes of applying collateral estoppel to the resulting determination." *Id.*

The 1991 decision by the MDJT was specific in holding that "there was no employer-employee relationship between [Ripley] and the employer, and remuneration paid to [Ripley] by the employer does not constitute wages under the Minnesota

Jobs and Training Law for unemployment tax and benefit purposes." This decision was apparently limited to Ripley and did not determine the status of any other individual members or the entire group of members of relator. Given the apparent reluctance of the legislature and this court to apply collateral estoppel to agency unemployment decisions, as evidenced by Minn.Stat. § 268.105, subd. 5a, and the *Clapper* case, the ULJ did not err in declining to give preclusive effect to the 1991 decision of the MDJT.

## II. Did the ULJ err in holding that relator's members are employees, and that relator is an employer, pursuant to Minnesota unemployment-insurance law?

██ This court views the ULJ's factual findings in the light most favorable to the decision, giving deference to the credibility determinations made by the ULJ and not disturbing the findings when the evidence substantially sustains them. *Skarhus v. Davanni's Inc.*, 721 N.W.2d 340, 344 (Minn.App.2006). Questions of law are reviewed de novo. *Abdi v. Dep't of Emp't & Econ. Dev.*, 749 N.W.2d 812, 814–15 (Minn.App.2008). Whether an employment relationship exists is a mixed question of law and fact. *Wise v. Denesen Insulation Co.*, 387 N.W.2d 477, 479 (Minn.App.1986). "Once the controlling facts are determined, the question whether a person is an employee becomes one of law." *Lakeland Tool & Eng'g, Inc. v. Engle*, 450 N.W.2d 349, 352 (Minn.App. 1990).

### A. Can members of a worker cooperative also be employees of the cooperative?

Minnesota law has not addressed whether the members of a worker cooperative can also be considered employees of the cooperative. But the United States Supreme Court has addressed this issue. In *Goldberg v. Whitaker House Coop., Inc.*, the Court determined that worker members of a cooperative that manufactured, sold, and dealt in knitted, crocheted, and embroidered goods were employees of the cooperative for the purpose of applying the Fair Labor Standards Act. 366 U.S. 28, 81 S.Ct. 933, 6 L.Ed.2d 100 (1961). The members worked from home to produce goods for the cooperative, and during their membership they were prohibited from furnishing others with the type of goods dealt in by the cooperative. *Id.* at 29, 81 S.Ct. at 934. Members received an "advance allowance" every month or every other month based on the amount of goods completed for the cooperative, and at the discretion of the cooperative's board of directors, "patronage refunds" could be distributed to members according to the amount of work completed. *Id.* at 30, 81 S.Ct. at 935. Each member had one vote, and members could be expelled by the board of directors if they violated any rules or regulations or if their work was substandard. *Id.* at 29–30, 81 S.Ct. at 934–35. The Court stated, "There is nothing inherently inconsistent between the co-existence of a proprietary and an employment relationship.... We fail to see why a member of a cooperative may not also be an employee of the cooperative." *Id.* at 32, 81 S.Ct. at 936. Rather than relying on "technical concepts," the Court looked at the "economic reality" of the situation and determined that the workers were both members and employees, and were not self-employed or independent. *Id.* at 32–33, 81 S.Ct. at 936. The members worked "in the same way as they would if they had an individual proprietor as their employer"; the cooperative afforded them the opportunity to work and paid them for it. *Id.* at 32, 81 S.Ct. at 936.

**B. Did the ULJ err in holding that there is an employment relationship between relator and its members?**

██ Relator argues that the ULJ erred in concluding that relator's members are employees of relator and that relator is an employer. Relator maintains that its members are self-employed.

██ Under Minnesota unemployment-insurance law, an "employee" is defined as "every individual who is performing or has performed services for an employer in employment...." Minn.Stat. § 268.035, subd. 13(1) (Supp.2005).[2] An "employer" is "any person which has had one or more employees during the current or the prior calendar year...." *Id.,* subd. 14 (Supp.2005). A "person" may be an individual, any type of organization or entity, or any government entity. *Id.,* subd. 21 (Supp.2005). "Employment" means service performed by "an individual who is considered an employee under the common law of employer-employee and not considered an independent contractor...." *Id.,* subd. 15(1) (2004).

> The traditional factors determining whether an employment relationship exists are: (1) The right to control the means and manner of performance; (2) the mode of payment; (3) the furnishing of material or tools; (4) the control of the premises where the work is done; and (5) the right of the employer to discharge.

*Wise,* 387 N.W.2d at 479 (quoting *Speaks, Inc. v. Jensen,* 309 Minn. 48, 50, 243 N.W.2d 142, 144 (1976)). "The nature of the relationship of the parties is to be determined from the consequences which the law attaches to their arrangements and conduct rather than the label they might place upon it." *Speaks,* 309 Minn. at 51, 243 N.W.2d at 145. "[W]hether the parties have entered into a contract defining their relationship is not determinative." *Wise,* 387 N.W.2d at 479. "In employment-status cases, there is no general rule that covers all situations, and each case will depend in large part upon its own particular facts." *St. Croix Sensory Inc. v. Dep't of Emp't & Econ. Dev.,* 785 N.W.2d 796, 800 (Minn.App.2010).

The ULJ found that evidence showed that members of relator work under essentially the same conditions as employees in that they are paid by the hour at an hourly rate set by relator; relator has the right to control the means and manner of performance of the members; relator has the right to discharge members with a two-thirds vote without incurring liability; members provide services that are in the course of the business of relator; and members have a continuing relationship with relator. In the reconsideration order, the ULJ further stated that members are compensated for their services and that this compensation constitutes wages. Applying the "economic reality" test used by the Supreme Court in *Goldberg,* the ULJ determined that these findings show that relator's members are employees of relator. 366 U.S. at 33, 81 S.Ct. at 936. On appeal, relator specifically disputes two of the ULJ's findings.

**1. Does the compensation members receive constitute wages?**

██ The ULJ found that the payments made to members are wages in that they

---

**2.** Because respondent determined that, effective January 1, 2006, relator is an employer subject to Minnesota unemployment-insurance law, and the ULJ held that unemployment-insurance taxes were due from relator for 2006 through 2010, the definitions cited here are from the version of the Minnesota statutes in effect as of January 1, 2006. These definitions have not been significantly changed through the current version of the statutes.

"are actually compensation for services which are adjusted after a profit/loss determination (similar to a draw paid to a sales representative which is adjusted at a later time)." Relator argues that the advances are loans against future patronage dividends, not wages.

Under Minnesota unemployment-insurance law, "wages" means "all compensation for services...." Minn.Stat. § 268.035, subd. 29 (2004). Effective August 1, 2007, this subdivision defining wages also includes the statement, "Wages includes advances or draws against future earnings, when paid, unless the payments are designated as a loan or return of capital on the books of the employer at the time of payment." *Id.*, subd. 29(e) (Supp.2007). "Wages paid" means "the amount of wages that have been actually paid or that have been credited to or set apart so that payment and disposition is under the control of the employee." *Id.*, subd. 30(a) (2004).

Under these definitions, the advances that members receive are wages. The advances are paid according to an hourly rate set by relator's personnel committee for services that each member provides. Relator lists the advances as "Advance Draws Paid to Members" on its balance sheet, not as loans or returns of capital. When paid, the advances are under the control of the members. Members keep the entire amount of the advances if relator is profitable during a fiscal year. Members keep any amount of the advances that is above their payback amount if relator sustains a loss during a fiscal year. That relator's membership agreement labels advances "loans" and relator refers to them as loans is not controlling. The evidence supports the ULJ's finding that relator's members receive wages.

## 2. Does relator have the right to discharge members?

 The ULJ found that relator has the right to discharge members with a two-thirds vote without incurring liability. Relator maintains that it does not have any authority to discharge members.

During the first year of membership, a new member may be expelled and required to surrender membership by a unanimous vote of the personnel committee, with input from members. After the first year, any member who knowingly, intentionally, or repeatedly violates a provision of relator's bylaws may, after a two-thirds vote of the members, be required by the board of directors to surrender membership and be expelled from relator. Relator argues that this two-thirds vote procedure is analogous to the right of partners to expel another partner from a partnership.

Under Minnesota unemployment-insurance law, "A discharge from employment occurs when any words or actions by an employer would lead a reasonable employee to believe that the employer will no longer allow the employee to work for the employer in any capacity." Minn.Stat. § 268.095, subd. 5(a) (2004). If a member of relator is expelled, that member no longer works or provides services for relator. The evidence supports the ULJ's finding that relator has the right to discharge members.

## 3. Application of the other traditional factors also indicates that an employment relationship exists between relator and its members.

 Regarding the right-to-control-performance factor, the ULJ found that relator "has the right to control the means and manner of performance of the member/workers" and that the "member/workers do have governance rights as do employees of a corporation who own shares of the corporate stock." The most important of the traditional factors to determine

whether an employment relationship exists is the right to control the means and manner of performance. *Wangen v. City of Fountain*, 255 N.W.2d 813, 815 (Minn. 1977). Relator's schedulers and managers set up work crews and designate coordinators and leaders for jobs and projects. Coordinators at job sites organize workers, make sure work is done satisfactorily, and have the right to expel workers from sites for nonperformance. Relator's personnel committee reviews members and their performance, sets advance rates, and deals with grievances and disciplinary issues. The evidence supports the ULJ's finding that relator has the right to control the means and manner of performance of its members.

The ULJ did not make a finding regarding the furnishing-of-material-or-tools factor. There is evidence that members have their own tool inventories and buy and use their own tools for their work. Regarding the control-of-premises factor, relator owns a shop where work is done led by project leaders. Work is also done on job sites, where coordinators organize the workers and make sure work is done in a workman-like fashion. Considering all of these factors together, the ULJ did not err in holding that relator's members are employees and that relator is their employer pursuant to Minnesota unemployment-insurance law.

### C. The parties' references to independent-contractor law are not on point.

The parties refer to the laws differentiating employees from independent contractors in the construction industry. But neither party is arguing that relator's members are independent contractors. Relator maintains that its members are self-employed. Respondent claims that the members are employees. The ULJ did not find that the members are independent contractors. The parties' references to Minn.Stat. §§ 181.723 and 268.035, subd. 9a (2010), the statutes used to differentiate employees from independent contractors for those performing building construction or improvement services, are not on point in this case.

### D. Could respondent determine that relator is an employer effective January 1, 2006?

In December 2010, respondent sent relator a notice stating that, effective January 1, 2006, relator is an employer subject to Minnesota unemployment-insurance law. Relator argues that respondent could not classify relator as an employer effective this far in the past.

Under Minn.Stat. § 268.043 (2010):

(a) The commissioner [of employment and economic development], upon the commissioner's own motion or upon application of a person, must determine if that person is an employer or whether services performed for it constitute employment and covered employment, or whether any compensation constitutes wages, and notify the person of the determination. . . .

(b) No person may be initially determined an employer, or that services performed for it were in employment or covered employment, *for periods more than four years before the year in which the determination is made,* unless the commissioner finds that there was fraudulent action to avoid liability under this chapter.

(Emphasis added.)

The determination that relator is an employer was made in 2010. The statute allows relator to be deemed an employer for the four years before 2010, that is, for years 2006 through 2009. Respondent's

determination was for the time period authorized by the statute.

## DECISION

The ULJ properly held that relator's members are employees and relator is an employer pursuant to Minnesota unemployment-insurance law, thereby obligating relator to pay unemployment-insurance taxes. The ULJ also properly held that this determination is not precluded by the 1991 decision of the MDJT.

**Affirmed.**